[No. S070686. July 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GERARDO ROMERO, Defendant and Appellant.

COUNSEL

Stephen M. Lathrop, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Robert F. Katz and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KENNARD, J.**—A jury convicted defendant Gerardo Romero of the murder of Eugene Afable (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated); the murder of Reynaldo Hau (§ 187); the attempted willful, deliberate, and premeditated murder and attempted second degree robbery of Francisco Piceno (§§ 664, 187, 211); the second degree robbery of Gabriel Hau Cruz (§ 211); and the attempted second degree robbery of Jose Aguilar (§§ 664, 211). The jury found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), and found that Reynaldo Hau was murdered during a robbery (§ 190.2, subd. (a)(17)(A)). The jury also found true allegations that defendant inflicted great bodily injury upon Francisco Piceno (§ 12022.7, subd. (a)) and personally used a firearm in the commission of each offense (§ 12022.5, subd. (a)). The jury returned a verdict of death, and the trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

I. Facts and Proceedings

A. *Guilt Phase*

1. *Prosecution's case*

On October 9, 1994, Ismael Magallanes was working as the manager of the J & L Video Store at the intersection of Temple Street and Rampart Boulevard in Los Angeles. Magallanes was acquainted with 17-year-old Eugene "Temper" Afable, a member of the Temple Street gang. Afable would sometimes come into the store to watch videos. On the night of October 9, Magallanes and Afable were watching a video at the store. Magallanes was sitting behind the counter; Afable was standing next to the counter, about four feet from Magallanes. At approximately 9:00 p.m., Magallanes heard a gunshot, saw Afable fall down, and got a glimpse of the shooter as he fled from the store. Afable was killed by a single bullet fired into the back of his head.

Several hours later, at 12:50 a.m., Detective John Freitas of the Los Angeles Police Department arrived at the murder scene. Afable was lying on his back wearing a black football jersey with the letters "T-S-T" on it, resembling jerseys worn by Temple Street gang members. About two feet away from the victim was a .380-caliber shell casing from an automatic pistol.

Store manager Magallanes described the shooter as a male Hispanic, five feet four inches to five feet six inches tall, clean shaven, with a light complexion, and a shaved head with a three-to-four-inch ponytail in the back. The next day, police showed Magallanes six photographs of different men. He selected defendant's picture as "close" or "similar" to, but heavier than, the shooter. At trial, Magallanes identified defendant with 90 percent certainty as the shooter.

Around 9:00 p.m. on October 9, 1994, the time of the Afable murder, Felix Callejas was inside the laundromat next to the J & L Video store when he heard a shot. He then saw a man, some 21 feet away from him, come out of the video store walking quickly. The man was light skinned, between 18 and 20 years old, and bald except for "a little pony tail." The next day, Callejas selected defendant's picture from a six-pack photographic lineup as bearing "some similarities with the person at the scene."

About midnight, three hours after the killing of Afable, Jose Aguilar, Francisco Piceno, Gabriel Hau Cruz, Joaquin Hau Cruz, and Reynaldo Hau were talking and drinking beer in front of a residence at 1022 North Bonnie

Brae Street, which is part of Temple gang territory and within a mile of the video store where Afable was killed. One of the men, Reynaldo Hau, was sitting in the car of his brother-in-law Gabriel Cruz, which was parked in the driveway of the residence. The other men were standing next to the car. They were approached by two men, one wearing a Halloween mask and the other wearing white pants, a dark shirt, and a baseball hat with the letters "L.A." on it.

The unmasked man pulled out a gun and demanded that the men in the group give him what they had. The gunman took Gabriel Cruz's Emit brand watch and Reynaldo Hau's Citizen watch. When Piceno told the gunman to take whatever he wanted, the gunman told him to "shut up" and hit him in the face with the gun, breaking his nose. Piceno fell to the ground and covered his face with his hands. The gunman knelt down, placed the gun on Piceno's hand and shot him in the face. The gunman attempted to strike Joaquin Cruz with the gun but dropped it in the process. While the gunman was picking up the gun, Gabriel Cruz and Piceno fled. They heard more gunshots and saw the two assailants run away. Gabriel Cruz went back to the driveway and saw Reynaldo Hau lying next to the car. Reynaldo Hau had been shot once in the chest and once in the leg. He later died from the gunshot wounds.

Detectives Charles Salazar and Robert Bub recovered four .380-caliber automatic gun shell casings from the crime scene at North Bonnie Brae Street.[1]

Later, at the police station, Detective Bub showed Gabriel Cruz and Joaquin Hau Cruz 25 photographs of persons known to the police as gang members. Gabriel identified defendant as the shooter; Joaquin did not identify anyone. At the hospital to which Piceno had been taken, he identified defendant's picture as looking "similar" to the gunman.

Between 8:00 and 8:30 a.m. on October 10, 1994, Detectives Salazar and Bub conducted a consensual search of defendant's bedroom at his parents' house. The detectives found an Emit watch, which robbery victim Gabriel Cruz identified as the watch taken from him. Also recovered were a .380-caliber ammunition clip with two live rounds in it, a plastic videocassette container that had defendant's name written on it and contained several .380-caliber rounds of ammunition, loose .380- and .22-caliber rounds, and two baseball caps, one with the letters L.A. on the front and the other bearing the words "WS Rockwood." Detective Bub arrested defendant.

---

[1] It was stipulated at trial that Hau and Afable were killed by bullets from the same gun. The gun itself was never recovered.

At trial, Gabriel Cruz identified defendant as the gunman in the robbery, and he again identified the Emit watch recovered from defendant's bedroom as the watch taken from him. Joaquin Cruz testified that defendant had the same face as the gunman. Piceno also identified defendant at trial as looking like the gunman.

Detective Vincent Balderamma, of the Los Angeles Police Department's Rampart Division's gang unit, testified as a gang expert. He stated that the Temple Street gang controlled the area around the J & L Video Store at the intersection of Temple and Rampart Streets, and that a rival gang named Rockwood had its territory roughly a mile away. The residence at 1022 North Bonnie Brae was outside the Rockwood gang territory, but within an area where Temple Street gang members congregated.

Detective Balderamma explained at trial that, in the culture of gangs, a gang member's standing or prestige within the gang would be increased by going into a rival gang's territory to "do a mission," such as a shooting or a robbery. In his opinion, the murder of Afable was a gang killing.

Detective Balderamma also described the significance of tattoos defendant got after his arrest and while incarcerated. The letters "RWST" and "LCS" tattooed on the back of defendant's shaved head identified him as a member of the Rockwood gang; the large size of the letters indicated defendant's pride in his gang. The letters "RW" tattooed on defendant's lower lip and left earlobe stood for Rockwood. The tattoos on his left wrist of three dots and the numbers "213," the telephone area code for Los Angeles, were symbols used by Los Angeles gangs. The tattoos of "Youngster 1," "VRWST," and "LCS" on defendant's lower right leg represented, respectively, defendant's gang name, Varrio Rockwood Street, and Locos. These tattoos showed others in jail and prison that defendant was proud to be a member of the Rockwood Street gang.

### 2. *Defense case*

In addition to challenging the credibility of prosecution witnesses, defendant presented an alibi defense. Martha Dravis testified that her daughter Carla had a number of people, including defendant and Magin Munoz, over to Dravis's house for a barbeque the afternoon and evening of October 9, 1994, the day of the murders. Defendant arrived at the home at 5:00 p.m. as Dravis was leaving to take her son to the hospital because he had a fever; defendant was still at the house when Dravis returned home at 9:00 p.m., the time the first victim, Afable, was killed. Magin Munoz, defendant's next-door neighbor and a member of the Rockwood gang, testified that he and defendant arrived at the Dravis house about 5:00 p.m. and did not leave until 10:30 or

11:00 p.m. Munoz said that the Rockwood and Temple Street gangs had never had problems with each other, but that there had been trouble between the Rockwood gang and the 18th Street gang, and that defendant was a member of the Rockwood gang.

### B. *Penalty Phase*

#### 1. *Prosecution's case*

At the penalty phase, the prosecution introduced evidence of defendant's prior violent conduct, summarized below.

Officer Kevin Burke of the Los Angeles Police Department testified that on May 27, 1993, he arrested defendant for attacking Tony Schmidt with a small ax. Schmidt was the manager of a building on West Sunset Boulevard in Los Angeles. When Schmidt confronted two men spray painting graffiti on the building, one of them pulled a small ax from his waistband and swung it towards Schmidt, whose little finger was cut when he raised his hand to protect himself. Schmidt retrieved a gun from his apartment and confronted the two again. As they ran towards Schmidt, one of the men raised the ax and the other pulled out a knife. The two fled when Schmidt fired his gun into the air three times. Five minutes later, one of the men (defendant) was found hiding in nearby bushes. He had an ax in the waistband of his pants. Schmidt identified defendant as his attacker.

Victor Can testified that just after midnight on October 9, 1993, he was at a bus stop on Beverly Boulevard in Los Angeles when four men came up to him. One of them held a knife to Can's neck while the others twisted his arms and told him not to move. They demanded money and threatened to cut Can's throat if he did not cooperate. When Los Angeles Police Officer Henry Covarrubias approached in a police car, the assailants fled. They were apprehended and later identified by Can. The parties stipulated that as a result of the attack on Can, defendant was convicted of the felony of attempted robbery and placed on probation subject to conditions that included a jail term of one year.

Gustavo Rosas, a member of the Rascals gang, testified that in the early morning hours of October 3, 1994, he was asleep at his home at 1022 North Bonnie Brae in Los Angeles when approximately seven gunshots were fired into his house. Rosas heard defendant, whom Rosas knew, yell, "Fuck trash cans," a derogatory term for the Rascals gang. Rosas gave the police four shell casings he had found on the ground. The parties stipulated that two of the bullet casings found by Rosas were fired from the same gun used in the October 9, 1994 murders of Eugene Afable and Reynaldo Hau.

Duk An testified that on the afternoon of December 2, 1994, he was in a county jail cell with other inmates. When someone took his personal belongings, An reported the theft to a deputy. When An confronted the person who had taken his belongings, he was attacked by six men, who kicked and punched him until he lost consciousness. Later, An identified defendant as one of the six attackers.

Los Angeles County Deputy Sheriff Jackie Spencer testified that on January 5, 1995, Isaac Gonzales was attacked while in the courthouse lockup by other inmates. When Gonzales did not identify his attackers, deputy sheriffs checked the other inmates for physical signs of involvement. Defendant and three others showed such signs, and defendant was breathing heavily. Immediately after that testimony by Spencer, the court, outside the jury's presence, told the attorneys that it would instruct the jury to disregard that testimony because a jury could not reasonably find that defendant's participation in the attack had been proven beyond a reasonable doubt. Later, during the reading of the jury instructions, the court did instruct the jury to disregard the testimony concerning Gonzales.

Enrique Diaz testified that in the late evening of March 6 and early morning hours of March 7, 1997, he was in the gang member section of the county jail while on trial for murder when he was told by other inmates to go to cell No. 9, which was occupied by defendant and another man. When Diaz denied being a gang member, both men beat him with their fists and kicked him while holding a homemade knife to his back. They then lowered Diaz's boxer shorts and said they were going to have sex with him. Diaz responded they would have to kill him first. Defendant attempted to sexually assault Diaz, including trying to force Diaz to orally copulate him. The beating lasted approximately four hours. Diaz was then beaten again in his cell by two other men. Diaz identified defendant as one of the men who had been involved in the beatings. He was hospitalized for three days. He said he was still having nightmares and headaches, and was suffering from mental problems. Diaz, who was serving a life sentence for murder when he testified at defendant's trial, said he was afraid of what would happen to him as a "snitch" after going back to prison.

The prosecution provided the following victim impact evidence at the penalty phase:

Eleno Afable, the father of murder victim Eugene Afable, testified that he and his son had been very close and that he had been devastated by his son's death. Eugene's mother, Ida Afable, testified that Eugene had been a Boy Scout, was thoughtful, and was affectionate towards her. Since his death she

has known nothing but sadness. His brothers and sisters stopped going to school for a semester when Eugene was killed, and they talked about his death regularly.

Maria Feliciana Hau Cruz, widow of murder victim Reynaldo Hau, testified that they had two children, a nine-year-old daughter and a three-year-old son. Reynaldo was a kind man, who cared much about his children. After his death and the loss of his support, she had to find work and as a result had to be separated from her children.

### 2. *Defense case*

At the penalty phase, defendant presented the testimony of Nancy Kaser Boyd, a clinical and forensic psychologist, who had evaluated defendant's personality. As a baby, defendant had a serious bacterial infection that caused a very high fever. That illness, according to Boyd, might explain his mental deficiency, that is, an intelligence quotient score of 77. Dr. Boyd described defendant as having had a happy early childhood, but said that he became depressed when his childhood friend, Joseph Sosa, died from cancer. At age 12, when his mother was hospitalized for two months with uterine cancer, defendant helped take care of his five brothers and sisters when his aunt was unable to do so. During this time he started failing in school. He became defensive and violent after someone stabbed him with a screwdriver in the alley behind his home. In Dr. Boyd's opinion, defendant is socially dysfunctional, a condition that can be successfully treated.

Maria Sosa testified that while her son Joseph was ill with cancer defendant often came to see him.

Angelina Romero, defendant's mother, testified that defendant was born healthy but developed serious health problems in early childhood. He was a nice boy, was very good at sports, which he played at the Boys and Girls Club, and he had a drawer full of trophies. Defendant was very sad when his friend Joseph died, but he recovered in a few days.

Rosalba Romero, defendant's sister, testified that family problems adversely affected defendant. Defendant lost his sports trophies when the family was evicted and lost everything except the clothes they were wearing. Defendant was badly hurt by the death of his friend Joseph from cancer. When defendant was 12 years old he took care of his five siblings while their mother was sick with cancer.

Martin Uitz, defendant's former neighbor, who had known defendant since the age of 10, testified that the two played sports together at the Boys and

Girls Club, that defendant was helpful, and that the death of defendant's friend Joseph caused defendant to have nightmares. Another childhood friend, Yenissen De Santiago, testified that he used to play sports with defendant at the Boys and Girls Club, that defendant was a good boy, that he never saw defendant hurt anyone, and that defendant stopped coming to the Boys and Girls Club when his friend Joseph became ill and died.

## II. GUILT PHASE ISSUES

### A. Sufficiency of Evidence

Defendant contends that his conviction for the murder of Eugene Afable violated his state and federal constitutional rights to due process because the evidence was insufficient. We reject the contention.

#### 1. Standard of review

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 170 [64 Cal.Rptr.3d 163, 164 P.3d 590].) The pertinent inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

#### 2. Identification

Defendant contends that the eyewitness testimony identifying him as the killer of Eugene Afable does nothing more than raise a suspicion of his involvement in the crime. We disagree.

Defendant points out that Magallanes, who was in the video store with Afable at the time of the shooting, said that he only got a glimpse of the fleeing shooter, that he described defendant's picture in the six-pack photographic lineup as being "close" and "similar" to but "heavier" than the shooter, and that his in-court identification of defendant was, in his words, "90 percent" certain. As to eyewitness Callejas, who was inside the laundromat next door to the video store, he testified that after hearing a gunshot some 21 feet away he then saw a man run out of the video store, that he selected defendant's picture from the six-pack photographic lineup based on "some similarities with the person at the scene," and that he did not make an

in-court identification. Defendant also observes that Magallanes had described the shooter as having a ponytail bound with a rubber band, while Callejas said the ponytail was unbound.

Next, defendant notes that no physical evidence such as fingerprints or DNA connected him to the scenes of the two killings. And the fact that the same gun was used to kill Afable and Hau, defendant argues, does not necessarily show that the same person used the gun in both killings. According to defendant, police recovery from defendant's bedroom of several rounds of ammunition of the same caliber that had been fired into the two murder victims was insufficient to link him to the murders because the ammunition was not unique to the gun used in the killings and because someone else—his brother—also occupied the same bedroom.

Defendant also asserts that the shooter did not act alone. In support, defendant points to eyewitness Callejas's testimony that when he heard the gunshot and saw the person come out of the video store where Afable was shot and killed, he also heard a car's engine start and saw a small car drive away. And defendant observes that two men, one wearing a Halloween mask and the other a baseball cap, were there when Hau was killed.

Viewing the record as a whole and presuming the existence of every fact the trier of fact could reasonably deduce from the evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]), we conclude that evidence that is reasonable, credible, and of solid value supports the jury's finding that defendant shot and killed Afable. Eyewitnesses Magallanes and Callejas identified defendant as having a ponytail and as the shooter of Afable the morning after the shooting. The same gun was used in the killings of Afable and Hau, and defendant was identified by Cruz and Piceno as the killer of Hau. Gabriel Cruz's Emit watch and ammunition consistent with that used in the Afable and Hau killings were recovered from defendant's bedroom. Even if the evidence could be reconciled with a different finding, that does not justify a conclusion that the jury's verdict was not supported by the evidence, nor does it warrant a reversal. (*Id.* at p. 1054.)

### 3. *Premeditation and deliberation*

Defendant contends the evidence is insufficient to support the jury's finding that his killing of Afable was premeditated and deliberate, thus constituting murder in the first degree. We disagree.

■ "The test on appeal is whether a rational juror could, on the evidence presented, find the essential elements of the crime—here including premeditation and deliberation—beyond a reasonable doubt." (*People v. Stewart*

(2004) 33 Cal.4th 425, 495 [15 Cal.Rptr.3d 656, 93 P.3d 271].) A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner. (*People v. Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942]; see *People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101] [*Anderson* provides framework or guidelines typically used to evaluate evidence of premeditation and deliberation].)

■ Here, there is evidence from which the jury could infer *planning*. Defendant brought a gun to the video store where, without any warning or apparent awareness of the impending attack, Afable was shot in the back of the head. And there was evidence of *motive*. Detective Balderamma, an expert on street gangs, testified that at the time of Afable's murder the Temple and Rockwood gangs were rival gangs; that Afable, when killed, was wearing a jersey with the letters "T-S-T," which signified membership in the Temple gang; and that killing a member of a rival gang would elevate the killer's status within his own gang and could lead to becoming a "shot caller" or leader in the gang. The testimony by defense witness Magin Munoz that defendant was a member of the Rockwood gang, and police recovery from defendant's bedroom of a baseball cap with the word "Rockwood" on it, support the conclusion that defendant was a member of the Rockwood gang. And the *manner* in which Afable was killed is indicative of premeditation and deliberation. Afable was killed by a single gunshot fired from a gun placed against his head. We have held that this execution-style manner of killing supports a finding of premeditation and deliberation when, as here, there is no indication of a struggle. (See *People v. Stewart, supra*, 33 Cal.4th at p. 495; *People v. Caro* (1988) 46 Cal.3d 1035, 1050 [251 Cal.Rptr. 757, 761 P.2d 680]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 [233 Cal.Rptr. 368, 729 P.2d 802].)

### B. *Failure to Instruct on Second Degree Murder*

Defendant contends that with respect to the killing of Hau the trial court should on its own initiative have instructed the jury on second degree murder. We disagree.

In count two of the information the prosecution alleged that defendant "did unlawfully, and with malice aforethought murder REYNALDO HAU" and it alleged the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and robbery murder (§ 190.2, subd. (a)(17)).

During discussions between the trial court and counsel on guilt phase jury instructions, the court stated that as to count two there were two prosecution theories—express malice murder and felony murder—and the court asked the

prosecutor whether he was going to proceed with both theories or just the theory of felony murder. When the prosecutor replied he would proceed with both theories, the court said: "If you go felony murder only, he is guilty of first degree murder or not guilty. [¶] If you throw in that additional express malice theory in count 2, then the jury must be given the option, obviously, to convict him of murder under the second degree under that theory." The court added that "the evidence will support either or both of those theories." Later in the discussions, the prosecutor said that he would proceed on count two only on the robbery-murder theory. When defense counsel responded that this was acceptable, the court said, "Count 2, felony murder only then."

■ Murder is an "unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) A killing that is "willful, deliberate, and premeditated" (§ 189) is murder of the first degree. Killings in the commission of certain specified felonies are also murder of the first degree (*ibid.*) under what is generally referred to as the felony-murder rule, as are murders in certain other circumstances enumerated in section 189 but not pertinent here. "All other . . . murders are of the second degree." (*Ibid.*)

Defendant argues that the trial court should have instructed the jury on second degree murder as a lesser included offense. Citing *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382], he asserts that the trial court's failure to so instruct violated his constitutional right to due process and the Eighth Amendment to the federal Constitution.

We have not previously determined whether second degree murder is a lesser included offense when, as here, the prosecution proceeds solely on the theory that the killing is first degree murder under the felony-murder rule and does not argue that the killing is first degree murder because it is willful, deliberate, and premeditated. (*People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 17 [8 Cal.Rptr.3d 271, 82 P.3d 296].) We need not decide this question here because, as we will explain, the evidence in this case did not support an instruction on second degree murder.

■ A defendant's constitutional right to have the jury determine every material issue presented includes the obligation of a trial court to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1158 [47 Cal.Rptr.3d 575, 140 P.3d 866]; *People v. Valdez, supra,* 32 Cal.4th at p. 115.) Thus, the trial court must give " ' "instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " (*People v. Valdez, supra,* 32 Cal.4th at p. 115, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77

Cal.Rptr.2d 870, 960 P.2d 1094].) "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*People v. Breverman, supra,* 19 Cal.4th at p. 162.)

In this case, when defendant approached the five men, including murder victim Hau, he demanded that they give him what they had. Cruz gave defendant his watch. When Piceno told defendant to take whatever defendant wanted, defendant used his gun to hit Piceno in the face, breaking his nose, and then shot him in the face. (Piceno survived.) While Hau was still sitting in the car, defendant took a Citizen watch from Hau, who minutes later was shot dead. This evidence overwhelmingly shows that defendant killed Hau while committing the felony of robbery. There was no evidence from which the jury could conclude that defendant killed Reynaldo Hau with malice, but without premeditation or deliberation, that is, second degree express-malice murder, and not as part of a robbery.

Defendant contends the jury could have found that the evidence showed beyond a reasonable doubt that defendant killed Reynaldo Hau and took his watch, while simultaneously finding that (1) the evidence did not show beyond a reasonable doubt that defendant initiated the encounter that led to Hau's death by demanding that Hau and his friends give defendant what they had, and (2) the evidence did not show beyond a reasonable doubt that defendant took Hau's watch *before* shooting him. Under this view of the facts, defendant argues, the jury could reasonably have found that defendant did not intend to take Hau's property until *after* he had shot Hau, and therefore that the killing did not occur in the commission of a robbery. Thus, he contends, the jury could have found him *not guilty of first degree murder* under the felony-murder rule (because the killing did not occur in the commission of a robbery) but *guilty of second degree murder* (because the killing of Hau was an unlawful killing with malice aforethought). Thus, he asserts, the trial court should have instructed the jury on the lesser included offense of second degree murder.

██ But that scenario is so implausible and unlikely on these facts that it would not have merited the jury's consideration. The *only* evidence at trial was that the killer accosted the victims, demanded property, and fired the fatal shot *after* taking Reynaldo Hau's watch. The defense did not dispute that Hau's death occurred during a robbery, and argued instead that defendant was not the killer. As a result, here, as in *People v. Valdez, supra,* 32 Cal.4th at

page 117, " '[a]ll the evidence points to robbery as the motive for the killing[],' " and "a jury finding of second degree murder . . . would have been based on pure speculation." Thus, as in *Valdez*, the trial court did not err in not instructing the jury on second degree murder as a lesser included offense. When, as here, "there was no substantial evidence supporting an instruction on second degree murder, the high court's decision in *Beck* [*v. Alabama, supra*, 447 U.S. 625] is not implicated." (*People v. Valdez, supra*, 32 Cal.4th at p. 118.)

■ In arguing to the contrary, defendant points to the trial court's comment that there was substantial evidence from which the jury could find defendant guilty of first degree murder *either* because the killing occurred in the course of a robbery *or* because it was a premeditated, deliberate killing. Defendant attempts to characterize this comment as expressing the view that the evidence could support a jury finding that the killing did not occur in the course of the robbery, and thus that there was evidence supporting an instruction on second degree murder. This mischaracterizes the trial court's comment; the court never said there was evidence that the killing did not occur in the course of a robbery. In any event, it is the evidence presented at trial, not the comments of the trial court, that determines whether a defendant is entitled to an instruction on a lesser included offense. (See *People v. Valdez, supra*, 32 Cal.4th at p. 116.)

### C. *Discussions Between Interpreter and Witnesses*

Defendant contends that unreported discussions at trial between the interpreters and three witnesses violated his right to confrontation under the Sixth Amendment to the United States Constitution, his right to due process under the federal Constitution, his state constitutional right to an interpreter, his right under California Rules of Court, rule 2.890(b) to a complete and accurate interpretation of everything that was said during the testimony of a witness, and his due process right to a record that is sufficient to permit adequate and effective appellate review.

### 1. *Background*

Witnesses Gabriel Hau Cruz, Francisco Piceno, and Victor Can testified in Spanish. Their testimony was translated into English by court-approved interpreters. The record reflects the following exchanges during that testimony.

a. *Gabriel Hau Cruz*

i. *Prosecution's direct examination*

"[Prosecutor]: Okay. Now when he first came up, Gabriel, we are just talking about the first part of the incident. [¶] Okay? [¶] He put the gun to you and he took your watch and put the gun to Luis. [¶] Did you see him take property from anyone else at the beginning of the incident?

"[Witness]: Well, I only saw—[¶] I didn't see that he took anything from him. But only—[¶] I saw when I—

"The Court: Sir—

"The Witness: When I was asked if they had taken something from my brother. My brother-in-law.

"The Court: Sir, I want you to do me a favor here. [¶] You will be out of here a lot quicker if you listen carefully to the question and simply answer the question that is asked. [¶] They will get this entire story out little by little, but just listen to the question carefully and take your time. [¶] I think the last question was at any time during this incident did you see property taken from anyone other than yourself. [¶] Yes or no.

"The Witness: No.

"The Court: All right. [¶] Next question.

"[Prosecutor]: At some point after he came up and tried to rob the group that you were with, Gabriel, did he drop the gun?

"[Witness]: Yes.

"Q What was he doing with the gun right before he dropped the gun?

"The Interpreter: *Your honor, let me inquire.*

"The Court: *Do so, please.*

"The Witness: He only hit my brother with the gun."

ii. *Defense cross-examination*

"[Defense counsel]: Now who was the person that he asked for? [¶] Do you remember the name?

"[Witness]: A He only asked for Eftie (phonetic).

"Q Can you spell that for us?

"A I do not know how you write that.

"Mr. Clark [defense counsel]: May I ask the interpreter to give me a phonetic spelling?

"The Court: Can you ask him if he is giving initials or giving a name.

"*(The interpreter conferred with the witness.)*

"The witness: Only a name. Eftie"

b. *Francisco Piceno*

i. *Prosecution's direct examination*

"[Prosecutor]: Now at some point when you were at the hospital, did the police come out and interview you?

"[Witness]: Yes.

"Q Do you remember them showing you different photographs?

"A Yes.

"Q And did you make a selection of one person in one of the photographs that looked familiar?

"A Yes.

"Q And what do you remember telling the police about the photo that you picked out?

"A That it was the first time I see him—

"The Interpreter: May I inquire, your honor?

"The Court: Yes.

"*(The Interpreter conferred with the Witness.)*

"The Witness: That it was my first time that I seen that picture up to that moment.

"[Prosecutor]: Now when you looked at that photograph, did you tell the police: [¶] That's definitely him, or did you tell them: [¶] That looks similar to him, [¶] or did you tell them something else?

"[Witness]: I said it looked like him."

ii. *Defense cross-examination*

"[Defense counsel]: How tall was the gunman, approximately?

"[Witness]: About one and seven meters.

"Q One and seven tenths meters?

"A One meter, seven centimeters.

"The Court: Are you sure that is what he said, Mr. Interpreter?

"*(The Interpreter conferred with the witness.)*

"[Witness]: I don't know exactly the measurement.

"The Court: I know. I just wanted to know what you said. [¶] Mr. Clark [defense counsel] said 1.7 meters and the interpreter said one meter and seven centimeters. [¶] Which was it if either?

"The Witness: Since I am 165—

"The Interpreter: I'm sorry.

"The Witness: Since I am 175, then I would say he was about 170.

"The Court: Are you talking weight or height?

"The Witness: Height.

"The Court: Height?

"The Witness: Yes.

"The Court: You are talking centimeters then, I take it.

"The Witness: yes. [¶] I am talking about meters and centimeters."

c. *Victor Can*

The record reflects the following during the prosecution's penalty phase direct examination of Victor Can concerning prior violent conduct of defendant in being involved in an assault on Can with a knife:

"[Prosecutor]: And what did you do as a result of this group surrounding you and at knifepoint demanding your money?

"[Witness]: Well, I told them that I didn't have anything.

"Q Okay. [¶] How afraid were you when they were doing this to you?

"A Well, the truth is a lot. [¶] I didn't know what to do. I was there alone at the bus stop.

"Q And at some point, it is your testimony, that you see the police driving by?

"A Yes.

"Q And that is still while you have the knife to your throat?

"A Yes. And I said: [¶] And if I have to die, I would rather die here like this. [¶] So then I got up and the officer saw me.

"Q And what happens at that point?

"A So then the officer arrived and two of them ran this way and the other two ran this way and then the officer came and asked me what happened (indicating).

"Q And at some point after you told the officer what happened, did the officer catch some of the people involved?

"A Yes.

"Q And over the next 10 or 15 minutes, did various police officers bring four of the five guys back to you so you could get a look at them?

"A Yes. Because the officer put me in his patrol car.

"Q All right. [¶] Did you identify those three, recognize and indentify those three, as three of the four robbers?

"A Yes.

"Q Now, Mr. Can, I don't want you to guess, but do you remember today what those three looked like?

"The Interpreter: Your honor, may I ask for a clarification?

"The Court: Yes.

"*(Interpreter spoke with witness.)*

"[Witness]: Since I came in here, I saw him right from here as if I were in front of him right now. [¶] Yes. Uh-huh.

"[Prosecutor]: Again, I am not asking you to guess, but do you recognize anybody in court today as being one of the three that the police caught?

"A Well, if I see his face, I do.

"Q All right. [¶] Can you say whether the gentleman in the orange jump suit at the end of the table is one of the three or not? [¶] Again, I don't want you to guess, but do you remember the face well enough to tell me if he was one of the three?

"A Well, the truth is—

"The Interpreter: Your honor, may I inquire?

"The Court: Yes.

"*(The interpreter conferred with the witness.)*

"[Witness]: Well the truth is, the way he is wearing his hair now, it's not the way he had his hair then.

"[Prosecutor]: Okay.

"The Court: Indicating the defendant for the record. [¶] The record should reflect that the defendant has had a haircut as well since we have come back in court having shaved it over the weekend.

"[Prosecutor]: Mr. Can, what did you do after the police took those three suspects to jail for robbing you?

"[Witness]: They took me to the police station on Temple and Rampart. And then—

"The Interpreter: You honor, may I inquire.

"The Court: Yes.

"*(The interpreter conferred with the witness.)*

"The Witness: Then the officer at 1:00 in the morning took me to work."

### 2. *Discussion*

■ In a criminal proceeding, an interpreter may perform three interrelated but distinct roles: (1) as a "witness interpreter," to enable questioning of witnesses who do not speak English; (2) as a "proceedings interpreter," to assist a non-English-speaking defendant to understand the exchanges at trial among attorneys, witnesses, and the court; and (3) as a "defense interpreter," to enable a non-English-speaking defendant to communicate with the defendant's English-speaking attorney. (*People v. Aguilar* (1984) 35 Cal.3d 785, 790 [200 Cal.Rptr. 908, 677 P.2d 1198] (*Aguilar*).)

■ The right to an interpreter has its underpinnings in a number of state and federal constitutional rights. These include a defendant's rights to due process, to confrontation, to effective assistance of counsel, and to be present at trial. (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1011 [232 Cal.Rptr. 132, 728 P.2d 202].) The California Constitution provides that a criminal defendant who does not understand English "has a right to an interpreter throughout the proceedings." (Cal. Const., art. I, § 14.) In addition, California Rules of Court, rule 2.890(b) (former rule 984.4(b)) states that an interpreter must interpret accurately, without embellishing, omitting, or editing, and when "interpreting for a witness, the interpreter must interpret everything that is said during the witness's testimony." Defendant here asserts that the unreported exchanges between the interpreters and the three witnesses quoted above violated the rights just mentioned and compels reversal of the judgment against him.

The Attorney General argues that defendant's failure to object at trial precludes him from now asserting a denial of his right to the assistance of an interpreter. Defendant, citing *Aguilar, supra,* 35 Cal.3d 785, maintains that the failure to object does not operate as a waiver of his right.

Defendant correctly points out that in *Aguilar, supra*, 35 Cal.3d at page 794, this court held that a defense counsel's acquiescence would not result in a defendant's waiver of the state Constitution's provision entitling a non-English-speaking defendant "to an interpreter throughout the proceedings." (Cal. Const., art. I, § 14.) Such a waiver, this court said, would require an affirmative showing in the record that the defendant personally waived the right, and that the defendant made the waiver intelligently and voluntarily. *Aguilar*, however, is not controlling here. Unlike *Aguilar*, this case does not involve the state constitutional right of a non-English-speaking criminal defendant to be provided with a "proceedings interpreter;" rather, it concerns alleged error involving "witness interpreters."

■ The Attorney General contends that defendant's failure to object presents an issue of forfeiture, not waiver. As we have observed previously, forfeiture results from the failure to invoke a right, while waiver denotes an express relinquishment of a known right; the two are not the same. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881 & fn. 1 [55 Cal.Rptr.3d 716, 153 P.3d 282].)

■ " '[A]s a general rule, "the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]' " (*People v. Kennedy* (2005) 36 Cal.4th 595, 612 [31 Cal.Rptr.3d 160, 115 P.3d 472].) The reason for this rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense. (*In re Sheena K., supra*, 40 Cal.4th at p. 881; *In re Seaton* (2004) 34 Cal.4th 193, 198–199 [17 Cal.Rptr.3d 633, 95 P.3d 896].) We see no reason why the general rule of forfeiture should not be applied to violations of rules of court or to claims of error relating to interpreters for the witnesses. Here, each of the claimed violations of defendant's rights could easily have been addressed and corrected in the trial court had defendant objected. His failure to do so precludes him from now asserting errors relating to the witness interpreters. (See *People v. Aranda* (1986) 186 Cal.App.3d 230, 237 [230 Cal.Rptr. 498] [failure to object to competency of interpreter during trial precludes issue from being raised on appeal].)

We likewise reject defendant's claim that because of the unreported discussions between the interpreters and witnesses, the record is insufficient to permit adequate and effective appellate review. The transcripts of the reported exchanges, which we quoted earlier, were sufficient to permit full review of what occurred at trial.

### D. *Gang Association*

Defendant contends that trial court comments during voir dire referring to evidence of gang affiliation and instructions given the jury concerning gang affiliation violated his state and federal constitutional rights to due process, trial by jury, and a fair trial. We disagree.

During voir dire the trial court twice stated that if gang evidence was introduced such evidence could be used only to show intent, motive, or identity and not as evidence of guilt.[2] At the guilt phase, the jury was instructed on the use of gang evidence and on motive. As to the use of gang evidence, it was told: "Gang membership evidence has been introduced in this case for the limited purpose of proving motive and intent to commit the crime charged. [¶] Such evidence may not be used for any other purpose, such as to assume a pre-disposition of the defendant to commit the crime." As to motive, the jury was instructed: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show that the defendant is not guilty."

Defendant argues that advising the jury that gang affiliation may be considered to prove motive followed by instructing the jury that the presence of motive may tend to establish guilt was improper because there was no substantial, credible evidence that he was associated with a gang when the crimes were committed or that the offenses were gang related. We disagree.

Defense alibi witness Magin Munoz, a member of the Rockwood gang, testified on cross-examination by the prosecution that defendant was a member of the Rockwood gang and that his gang name was Steam. A baseball cap bearing the name "Rockwood" was found in defendant's bed-room. This evidence is sufficient to support a finding that defendant was associated with the Rockwood gang when the crimes in this case were committed. When considered with that evidence, defendant's acquisition of gang-related tattoos after the crimes were committed and while he was incarcerated provides additional evidence of defendant's gang affiliation. To

---

[2] This court addressed the admissibility of evidence of gang membership in *People v. Hernandez* (2004) 33 Cal.4th 1040 [16 Cal.Rptr.3d 880, 94 P.3d 1080]. We there noted: "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Id.* at p. 1049.)

prove that the crimes were gang related, the prosecution presented gang expert testimony that defendant's Rockwood gang and the Temple gang to which murder victim Afable belonged were enemies and that a gang member could elevate his standing within his own gang by committing crimes in a rival gang's territory. Here, Afable was killed in Temple gang territory and Hau was killed outside of Rockwood gang territory in an area that a Rockwood gang member would consider enemy territory. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 617–620 [59 Cal.Rptr.2d 356, 927 P.2d 713].) We consider this sufficient evidence of a gang-related connection to the crimes.

### E. *Instruction on First or Second Degree Murder*

Defendant faults the trial court for instructing the jury: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by the defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or the second degree, you must give the defendant the benefit of the doubt and return a verdict fixing the murder as of the second degree." He argues that requiring the jury to first unanimously agree to acquit a defendant of a greater charge before convicting the defendant of a lesser charge violated his state and federal constitutional rights to due process and a jury trial because it precluded the jury from fully considering lesser included offenses. As defendant concedes, we have in the past rejected this argument. (*People v. Fields* (1996) 13 Cal.4th 289, 309 [52 Cal.Rptr.2d 282, 914 P.2d 832].) We see no reason to revisit the issue here. (*People v. Cox* (2003) 30 Cal.4th 916, 967 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

### F. *Record Correction*

On February 24, 1998, the trial court instructed the jury at the guilt phase. The reporter's transcript of that proceeding indicates that in the course of giving the jury instruction on special circumstances the court stated: "You must *not* decide separately each special circumstance alleged in this case. If you cannot agree as to both of the special circumstances but can agree as to one, you must make your finding as to the one upon which you do agree." (Italics added.) The jury was also given written copies of the instructions for its use during deliberations. Sometime after the trial, however, those written instructions were lost, and they are not part of the record before us.

On November 1, 2002, the trial court held a record certification proceeding. The same judge who had presided at trial presided at the certification proceeding, which was attended by the prosecutor, the trial defense attorney, the appellate defense attorney, and a deputy attorney general. Among the

court's proposed corrections to the record, which were faxed to counsel before the proceeding, was to strike the word "not" from the sentence in the reporter's transcript that read, "You must not decide separately each special circumstance alleged in this case."

After appellate defense counsel objected to this proposed change in the reporter's transcript, the trial prosecutor said that he would "generally follow along" the reading of instructions and that "if I overheard a jury instruction which I believe was incorrectly being read . . . it would be my practice to approach and ask the court to correct that." Then, after having quoted the statement at issue here, the trial prosecutor said he did not ask the court for any correction. The court commented: "I'm aware of it. It's an absolute mistake by the court reporter, as clear as it can be, as are these others." The court went on to say: "I would never read it that way. I never did. The written instruction, I guarantee, didn't say that. That's why I'm correcting it because it's erroneous and it is not appropriate to have an erroneous record go up. [¶] I'm as sure of that as I am that I'm sitting here breathing today." After the court noted that people do misspeak on occasion, "but I didn't on that occasion," appellate defense counsel observed that "this isn't a grammatical error." The court responded: "It is an error nonetheless, counsel. That's an error and the court is about to correct it over your objection." The court expressed its "certainty that these are errors of transcription," and it had the record reflect that pattern jury instructions were used in this case.

■ Defendant contends the trial court's correction of the record was based on speculation violating his right to due process. We disagree. As defendant concedes, a trial court has a duty to correct the record. (*Williams v. Davis* (1946) 27 Cal.2d 746, 753 [167 P.2d 189].) A trial judge's own memory is among the considerations that may be taken into account in making corrections to the trial record. (See *Marks v. Superior Court* (2002) 27 Cal.4th 176, 196 [115 Cal.Rptr.2d 674, 38 P.3d 512].) Here, as discussed above, the judge was certain that the court reporter had made an error in transcription, and the judge's correction reflected the language of the standard jury instruction on special circumstances. (CALJIC No. 8.80.1 (1996 ed.).)

Likewise misplaced is defendant's contention that the trial judge's correction of the trial record was invalid because the judge bypassed proper record settlement procedures. In support, defendant cites *Marks v. Superior Court, supra*, 27 Cal.4th 176. That case involved the question of whether the proper procedures were followed in the preparation of a settled statement, which is used when a portion of the proceedings was not reported or cannot be transcribed. (*Id.* at pp. 192–193; Cal. Rules of Court, rules 8.130(g), 8.137; *id.,* former rule 7.) At issue here was the making of a correction to a transcript of trial proceedings (Cal. Rules of Court, rule 8.619), not an effort,

as in *Marks*, to fill in gaps in a record through a settled statement. Also, in *Marks* the trial judge effectively eliminated the parties' participation in the process by making the judge's own settled statement that was not subject to "negotiations." (27 Cal.4th at pp. 194–195.) By contrast, although here defendant and the court reporter were not at the record correction proceeding, present were the judge who had presided at trial, the trial attorneys for both the defense and the prosecution, as well as the appellate attorneys for both parties, and they participated or had an opportunity to participate in the process. We also reject defendant's assertion that under *People v. Lucas* (1995) 12 Cal.4th 415, 468–469 [48 Cal.Rptr.2d 525, 907 P.2d 373], we must remand the matter for additional proceedings to settle the record. In *Lucas* there was a remand because there had been no proceeding in the trial court to correct the record; here there was such a proceeding.

### G. Jury Instructions

Defendant contends the trial court erred in giving four standard jury instructions that, according to defendant, had the effect of lessening the prosecution's burden of proof in violation of his state and federal constitutional rights to due process, to a jury trial, to present a defense, to a unanimous jury verdict, and to a reliable verdict. Each of the challenged instructions (CALJIC Nos. 2.01 [sufficiency of circumstantial evidence], 2.02 [sufficiency of circumstantial evidence to prove specific intent or mental state], 8.83 [special circumstance—sufficiency of circumstantial evidence—generally], and 8.83.1 [special circumstance—sufficiency of circumstantial evidence to prove required mental state]) told the jury that if one interpretation of circumstantial evidence appeared reasonable and another interpretation unreasonable, the jury must accept the reasonable interpretation. Defendant argues that because the instructions contained the language "appears to be reasonable," the instructions allowed the jury to find guilt based on proof less than beyond a reasonable doubt.

As defendant recognizes, we have in the past rejected this argument. (*People v. Maury* (2003) 30 Cal.4th 342, 428 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Hughes* (2002) 27 Cal.4th 287, 346–347 [116 Cal.Rptr.2d 401, 39 P.3d 432].) The instruction does not, as defendant tries to portray it, simply tell the jury that it must accept a reasonable interpretation. It tells the jury that it must accept a reasonable interpretation when the only other interpretation available is unreasonable. And the jury was instructed through CALJIC No. 2.01 that if there were two reasonable interpretations of the evidence, the jury must adopt the interpretation favorable to the defendant. As we stated in *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887], in rejecting this same argument: "When the questioned phrase is read in context, not only with the remaining language within each

instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence."

Nor did the prosecutor's closing argument misuse the language of the instruction to lessen the prosecution's burden of proof beyond a reasonable doubt. In closing argument the prosecutor explained that the reasonable doubt standard asks jurors to "decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable." Nothing in the prosecutor's explanation lessened the prosecution's burden of proof. The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt.

Also unpersuasive is defendant's argument that the prosecution's burden of proof was lessened by language in CALJIC No. 2.01, which told the jury that if there were two reasonable interpretations of the circumstantial evidence, one pointing to guilt and the other to innocence, the jury must accept the one pointing to innocence. Contrary to defendant's contention, this instruction does not require defendant to come forth with evidence and thereby shift the burden of proof from the prosecution to the defense. It is true that if a defendant cannot explain or counter incriminating evidence adduced by the prosecution, the defendant may be found guilty of the crime charged, but that is a consequence of the evidence pertaining to the defendant's wrongdoing, not an error in the jury instructions.

Likewise without merit is defendant's challenge to the instruction on a defendant's right to rely on the state of the evidence. That instruction, CALJIC No. 2.61, as given states: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt *every* essential element of the charge against him. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element." (Italics added.) We reject defendant's argument that the instruction's use of the word "every," as italicized above, permits conviction of a defendant if the jury finds that the prosecution proved beyond a reasonable doubt some but not all of the elements of the charged offense. That the instruction correctly tells the jury that the prosecution must prove "every" essential element of the charged crime is clear from the language appearing thereafter, stating that a defendant's failure to testify cannot make up for the prosecution's failure of proof "on any such essential element." We conclude there is no reasonable likelihood that the jury misconstrued or misapplied the instruction at issue.

## H. *Defendant's Absence During Response to Jury Question*

Shortly before noon on February 24, 1998, the jury retired to deliberate. The trial court then advised defendant that he had "a right to be present every time we do anything, if we answer a question or give readback or whatever." The court asked defendant if he would allow his counsel to "exercise that right" on defendant's behalf and to determine when there would be a need for defendant to be brought back into the courtroom. Defendant agreed.

The next morning, the jury sent this note: "What time was the suspect identified by the first two witnesses? [¶] Immediately after, that evening or the next morning?" The court and counsel for both parties discussed the question and agreed to respond that the suspect was identified the next morning. When the court asked defense counsel whether defendant needed to be present when the answer was given to the jury, counsel responded, "If it does not go any farther than that, I would say no."

The following colloquy then occurred in the jury's presence but outside defendant's presence:

"[The Court] We got your note. Let me read it.

"[¶] Once again, counsel and the court discussed it.

"[¶] Your question is: what time was the suspect identified by the first two witnesses immediately after? That evening or the next morning?

"[¶] Signed by the foreperson dated February 24th.

"[¶] When you say first two witnesses, you mean the first two civilian witnesses from over at the video incident?

"[Juror No. 8] In the first incident. Yes.

"[The Court] All right. Counsel has conferred and the answer is the next morning. Am I correct, gentlemen?

"[Prosecutor] Yes.

"[Defense counsel] Yes.

"[The Court] The next morning.

"[Juror No. 8] Okay. The question again, is what time the next morning.

"The concern is about the lapse of time in questioning the witnesses and whether there was maybe a problem in recalling the events as they occurred because there was so much time involved, as I understand the question.

"There was a memory lapse question.

"[The Court] I don't know—I don't want to know what you guys are doing. If you have another question, put it in writing and we will do our best to answer it. We have answered this one. If you have another one, fill out a form and I will keep counsel standing by here. Let's do it that way rather than just ad hoc.

"[Juror No. 8] Okay."

The trial court then granted Juror No. 8's request to allow the jury 10 minutes for further discussion. Fourteen minutes later, the jury returned to the courtroom. When the court asked Juror No. 8, "What do you need?," the juror replied that the jury had no further questions and that counsel did not have to be kept waiting any longer. The jury then resumed deliberations.

Defendant contends the colloquy between the trial judge and Juror No. 8 violated his federal and state constitutional rights to confrontation and due process and his statutory right under section 977 to be present during all critical stages of the trial. As to his constitutional right, he argues the exchange between the judge and the juror exceeded his waiver of the right to be present. As to his statutory right, defendant asserts the waiver was invalid because it was not in writing.

■ "A criminal defendant charged with a felony has a due process right under the Fifth and Fourteenth Amendments to the United States Constitution, as well as a right to confrontation under the Sixth Amendment, to be present at all critical stages of the trial. [Citation.] A competent defendant may waive that right, however. [Citation.] Neither the constitutional right to confrontation nor the right to due process precludes waiver of a defendant's right to be present at a critical stage of a capital trial. [Citation.] Section 977 permits a felony defendant, with leave of court, to waive his or her presence at all stages of the trial other than arraignment, plea, presentation of evidence, and sentencing. Section 977 requires, however, that the defendant personally execute, in open court, a written waiver of the right to be present." (*People v. Coddington* (2000) 23 Cal.4th 529, 629 [97 Cal.Rptr.2d 528, 2 P.3d 1081].)

Because defendant here did not personally execute a written waiver, his statutory right under section 977, subdivision (b)(1) to be present was violated. We need not, however, decide whether Juror No. 8's statements

made in court when defendant was not present exceeded the scope of defendant's waiver of his presence for purposes of his constitutional rights. Under any standard of harmless error, the violation of the statutory right and any violation of the constitutional rights did not prejudice defendant. As mentioned earlier, the trial court did not respond to Juror No. 8's comments beyond advising the juror that any further questions by the jury should be put in writing for consideration by the court and counsel. After a brief meeting, the jury returned to the courtroom and announced it had no further questions. Under the circumstances, we conclude beyond a reasonable doubt that there was no prejudice to defendant when in his absence the trial court, in the presence of counsel, responded to a question from the jury.

### I. Trial Court's Statement to Prospective Juror

During voir dire, a prospective juror told the trial court that in a different case in which the prospective juror had served as a juror, another juror had considered "things other than the evidence" and that no one informed the court of the juror's actions. This prompted the court in this case to tell the prospective jurors: "If any juror for whatever reason cannot or will not follow the law, it is the obligation of that juror and each juror to let the Court know so that we can, if necessary, get somebody in there that can. [¶] It is not appropriate deciding the case based on things, evidence not received, things the person knows about the scene, for example, or anything of that nature. [¶] But the Court will not be able to do anything about it unless somebody tells the Court that." That language closely resembles the language of CALJIC former No. 17.41.1 that instructed the jury that if any juror refused to deliberate or expressed an intention to disregard the law or to decide that case on any improper basis, it was the duty of other jurors to so inform the court immediately. In *People v. Engelman* (2002) 28 Cal.4th 436, 449 [121 Cal.Rptr.2d 862, 49 P.3d 209], we held, "in the exercise of our supervisory power . . . that CALJIC No. 17.41.1 not be given in trials conducted" (citations omitted) after our decision in that case.

Defendant contends the trial court's statement violated his federal constitutional rights to a jury trial and due process. He argues that the court's statement invaded the requisite secrecy of jury deliberations undermining "the jury's free exercise of the power of nullification." As defendant concedes, this court has in the past rejected the argument that the language of CALJIC former No. 17.41.1 violates federal or state constitutional rights. (*People v. Brown* (2004) 33 Cal.4th 382, 393 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Engelman, supra*, 28 Cal.4th at pp. 444–445.) We see no reason to reconsider that view.

J. *Cumulative Effect of Guilt Phase Errors*

Defendant contends the cumulative effect of error at the guilt phase compels reversal of the judgment. We disagree. We have found only minor errors and our careful review of the record convinces us that the errors were not prejudicial to defendant.

### III. PENALTY PHASE ISSUES

A. *Developmental Disability and Competence*

Defendant contends the trial court violated his state and federal constitutional rights to due process when it did not on its own initiative suspend the criminal proceedings because there was sufficient evidence to raise a doubt as to whether defendant was developmentally disabled. We disagree.

Section 1367, subdivision (a) prohibits trying a person who is mentally incompetent. Mental incompetency exists "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (*Ibid.*) If the trial court has a doubt as to the mental competency of the accused, it must suspend proceedings until the issue of mental competency has been determined.

At the penalty phase, defense Psychologist Nancy Kaser Boyd testified that defendant was mentally deficient, that the deficiency arose before defendant was 18 years of age, and that the deficiency constituted a substantial disability. This testimony, defendant asserts, provided evidence of his developmental disability, triggering the trial court's duty to declare a doubt as to defendant's mental competency and to suspend the criminal proceedings.

A trial court's duty to suspend criminal proceedings, however, arises only when there is a doubt as to defendant's *competency* to stand trial (§ 1368, subd. (a)), not when there is merely a doubt as to the existence of a mental disorder or developmental disability that does not implicate a defendant's competency to stand trial. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047 [47 Cal.Rptr.3d 467, 140 P.3d 775].) The trial court's obligation arises when there is a doubt "as to the mental competence of the defendant . . . ." (§ 1368, subd. (a).) Here, defendant concedes that the evidence did not raise a doubt on the issue of mental competence.

B. *Right to Confront Adverse Witnesses*

At the penalty phase, Los Angeles Police Officer Kevin Burke testified to certain statements by Tony Schmidt about defendant's attack on Schmidt with

a hammer-sized ax. Officer Burke testified, after the trial court overruled a defense hearsay objection, to the following: On May 27, 1993, he and his partner, in response to a call, arrived at a building on West Sunset Boulevard in Los Angeles. Tony Schmidt (who was deceased by the time of the trial in this case) came running up to the police car. He was yelling, and very upset. Schmidt had a cut on the little finger of his right hand, which was bleeding. Schmidt said that he was the one who had called the police and that he was the property manager of the building. Schmidt related that when he confronted two men spray painting graffiti on the building and told them to stop, one of them pulled a small ax from his waistband and swung it at Schmidt, hitting Schmidt's little finger with the ax when Schmidt put his hand up to protect himself. Schmidt then went to his apartment, got a gun, and again confronted the two men, who threatened to attack him with the small ax and a knife. When Schmidt fired three shots into the air, the two men fled. A few minutes later, two police officers working with Officer Burke found two men hiding in some bushes down the street. A small ax was found on defendant. Schmidt identified the two men, one of whom was defendant, as his attackers. The total time that elapsed between Schmidt's first approach of Officer Burke and Schmidt's identification of defendant was approximately five minutes.

Defendant contends the admission into evidence of Officer Burke's testimony as to victim Schmidt's statements describing the ax attack and his later identification of defendant violated his federal constitutional right to confront adverse witnesses. Even assuming the right to confront and cross-examine witnesses applies to the penalty phase of a capital trial, that right was not violated here, as we explain below.

 In support of his contention, defendant cites the United States Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]. There the high court held that the confrontation clause of the Sixth Amendment to the federal Constitution prohibits "admission of *testimonial* statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, at pp. 53–54, italics added.)

Thereafter, in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], the high court gave this explanation: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at

p. 822.) As this court observed in *People v. Cage* (2007) 40 Cal.4th 965, 991 [56 Cal.Rptr.3d 789, 155 P.3d 205], statements are not testimonial simply because they might reasonably be used in a later criminal trial. Rather, a critical consideration is the primary purpose of the police in eliciting the statements. Statements are testimonial if the primary purpose was to produce evidence for possible use at a criminal trial; they are nontestimonial if the primary purpose is to deal with a contemporaneous emergency such as assessing the situation, dealing with threats, or apprehending a perpetrator. (*Id.* at p. 984; see *Davis, supra,* 547 U.S. at p. 832.)

Applying those holdings to the facts here, we conclude that victim Schmidt's statements to Officer Burke were not testimonial. Officer Burke, responding to an emergency call, encountered an agitated victim of a serious assault, who described defendant's attack on him with a small ax. The statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. The statements were not made primarily for the purpose of producing evidence for a later trial and thus were not testimonial. The same is true of the statements pertaining to identification. The primary purpose of the police in asking victim Schmidt to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat.

In any event, any error was not prejudicial. Defendant was found with the hammer-sized ax used in the attack shortly after it occurred, and at the penalty phase the prosecution introduced sufficient evidence of other incidents of defendant's violent propensities. Such evidence included defendant's conviction for the attempted robbery of Victor Can, the firing of shots into the home of Gustavo Rosas, and defendant's participation in the brutal beatings in prison of Duk An and Enrique Diaz. We conclude that any error in admitting victim Schmidt's statement identifying defendant as a perpetrator of the attack on him was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

C. *Trial Court's Comments on Voir Dire, and Jury Instructions*

Defendant contends the trial court violated his state and federal constitutional rights to due process, to a jury trial, to present a defense, to a penalty determination based on all available mitigating evidence, and to a reliable penalty determination by giving biased explanations to prospective jurors during voir dire, and by improperly placing on the jury the burden of

determining which guilt phase instructions applied to the penalty phase. He also complains that the court gave the jury an incorrect supplemental instruction during defense counsel's closing argument. We reject these contentions.

### 1. *Trial court comments during voir dire*

During voir dire of the first and second panels of prospective jurors, the trial court made general comments about capital cases. The court explained that aggravating factors make the crime worse than it normally would be and that mitigating factors are the opposite, as they tend to ameliorate the punishment. The court gave brief examples of aggravating and mitigating factors. In its comments to the first panel, the court cautioned that "[t]hese are just examples; not at all an exhaustive list." In its comments to the second panel, the court stated, "And the court will give you a rather exhaustive list, if we ever get to that point." In addition, during the voir dire of a prospective juror on the second panel, the trial court commented: "You have to weigh the bad things, serious things about the case, versus the mitigating factors, the things that make the crime perhaps less blameworthy or good things about the defendant's background."

Defendant argues that the trial court's comments, which he mischaracterizes as jury instructions, were biased and misled the jury because they did not include a statement that mitigation includes any other circumstance that extenuates the gravity of the crime. (§ 190.3, factor (k).) The trial court, however, was not instructing the jury at the time it made the comments in question. Indeed it was conducting voir dire of prospective jurors. Its "comments 'were not intended to be, and were not, a substitute for full instructions at the end of trial.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 636 [110 Cal.Rptr.2d 441, 28 P.3d 175].) " 'The purpose of these comments was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death penalty trials in particular, a general idea of the nature of the proceeding.' " (*People v. Livaditis* (1992) 2 Cal.4th 759, 781 [9 Cal.Rptr.2d 72, 831 P.2d 297].) In the context of voir dire, the trial court's comments in this case were proper.

### 2. *Penalty phase instructions*

Just before the trial court read to the jury the penalty phase instructions, it commented: "I am not going to reread to you the guilt phase instruction packet. There is no need to do so. And a great many of those instructions simply no longer apply, you don't need to concern yourself with them. However, you may refer to the guilt phase instructions for definitions [of] such things as attempted robbery for example will be mentioned in these

instructions, it was also mentioned in the guilt phase so you may if you need to refresh your recollection as to what that charge entails, for example you should take a look at the guilt phase instructions. Likewise, the term reasonable doubt is used in a portion I will read you now, reasonable doubt is defined in the guilt phase instruction so if you need to refer back to that you may. [¶] Likewise, credibility of witnesses so forth, we had witnesses testify, both phases so when you get to judging credibility again guilt phase instruction 2.20 touched on that. Many of them will apply. If you need further clarification whether one does or does not apply, let us know, send a note out and we will certainly deal with it. Primary difference was at the guilt stage I told you all not to consider penalty or punishment and I've told you not to consider sympathy and things of that nature. And now those instructions no longer apply because of [sic] the penalty phase you are obviously to consider penalty and punishment and the sympathetic factors set forth and shown by the evidence are not to be ignored by the jury in th[is] phase. That will be the primary difference." The trial court also instructed the jury to "[d]isregard all instructions given to you in other phases of this trial if they conflict with anything stated in these instructions."

Defendant contends the trial court's failure to specify for the jury which of the guilt phase instructions were to apply at the penalty phase must have misled the jury. Of particular significance, defendant argues, was the guilt phase instruction that the jury was not to be influenced by, among other things, sympathy. There was no error.

■ Defendant correctly observes that a trial court's failure to specify which previously given guilt phase instructions apply at the penalty phase may mislead the jury (*People v. Weaver* (2001) 26 Cal.4th 876, 982 [111 Cal.Rptr.2d 2, 29 P.3d 103]), and that we have admonished trial courts that they should "expressly inform the jury at the penalty phase which of the instructions previously given continue to apply" (*People v. Babbitt* (1988) 45 Cal.3d 660, 718, fn. 26 [248 Cal.Rptr. 69, 755 P.2d 253]). But a trial court's failure to do so is error only if there is a reasonable likelihood that the jury was misled. (*People v. Weaver, supra*, 26 Cal.4th at p. 984.) No such reasonable likelihood is present here. The trial court told the jury that many of the guilt phase instructions would not apply at the penalty phase, and to disregard any guilt phase instructions that conflicted with the penalty phase instructions. And it specifically singled out punishment and sympathy as matters "obviously" to be considered by the jury at the penalty phase. Accordingly, no error occurred.

### 3. *Supplemental instruction*

The trial court interrupted defense counsel's penalty phase argument to give the jury a supplemental instruction. Defendant contends the supplemental instruction improperly limited the jury's consideration of defendant's good character evidence. We disagree.

During his penalty phase argument to the jury, defense counsel said: "I also believe that both that the families involved here and there are three, there's the Hau family, there's the Afable family, and there's the Ramirez [Romero] family. If you think the Ramirez [Romero] family isn't hurt, you haven't been thinking. I see in your sympathetic consideration no reason why after putting two families through this I know of no mother, as a matter of fact you heard it yesterday, when Mrs. Romero is still in denial. She's not unusual in that fashion. Even though I am a member of a mother/son relationship, they are estranged. And I can understand how they are. [¶] So it's not that Gerardo hurt other people, he hurt his family, too. I see no reason to increase that, particularly when you can't bring Reynaldo back, or you can't bring Eugene back. There is no way. [¶] The way the sheriff handles things hopefully it will get better. I'm not here to dump on the sheriff, there is enough people dumping on him already with respect to getting health care for the inmates, or I don't know but the way that you solve how the sheriff behaves, how these incidents." The trial court then interrupted defense counsel and told the jury: "Your job is to weigh the aggravation, weigh the mitigation, arrive at a penalty in that fashion. That is without regard to the effect that that decision will have on anyone other than this defendant. So you can't vote for death to make the victim's family better. You can't hold for life to make the defendant's mother feel better. That is not what this is about. This is not about the sheriff's department or sending a message if we will hear that."

■ Defendant faults that supplemental instruction for not telling the jury his family's feelings for him were relevant as evidence of his character. We perceive no error. The trial court's comments were prompted by defense counsel's argument to the jury that the defendant's punishment should not be death because that would worsen the anguish of defendant's family. As this court held in *People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442], "sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but . . . family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character." Fairly read, here defense counsel's argument was designed to invoke sympathy for defendant's family, not to highlight a positive attribute of defendant's background or character. Consequently, there was no error in the challenged instruction.

### D. *Request to Give Postverdict Testimony*

The trial court explained to defendant his right to testify at the penalty phase, in which event he would be subject to cross-examination. Defendant asked if he would "be able to testify after I find out the verdict or whatever it might be?" The trial court replied that he could not. Defendant asserts that his request to "testify" was a request for allocution, which he defines as an unsworn statement to the sentencing judge or jury that is not subject to cross-examination in which the defendant can ask for mercy, apologize, or say anything else in an effort to lessen the impending sentence. The trial court's ruling, defendant asserts, violated his federal constitutional right to allocute. We disagree.

 As defendant concedes, "we have repeatedly held there is no right of allocution at the penalty phase of a capital trial." (*People v. Lucero* (2000) 23 Cal.4th 692, 717 [97 Cal.Rptr.2d 871, 3 P.3d 248]; accord, *People v. Davenport* (1995) 11 Cal.4th 1171, 1209 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Clark* (1993) 5 Cal.4th 950, 1036 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) In addition, defendant did not make a request for allocution as he defines that term. Defendant asked to make a statement only *after* the jury reached its penalty verdict. Because in a capital case the trier of fact, here a jury, determines the sentence at the penalty phase of the trial (§ 190.3), a request to make a statement *after* the jury has already determined the sentence cannot be an effort to lessen the impending sentence. Nor, contrary to defendant's assertion, could his statement later have affected the judgment of death. The jury's penalty verdict is reviewed by the trial court on an automatic motion to modify the death verdict. (§ 190.4, subd. (e).) The trial court at the hearing on the motion to modify is limited to considering the evidence presented at the penalty phase of the trial. (*People v. Cleveland* (2004) 32 Cal.4th 704, 766 [11 Cal.Rptr.3d 236, 86 P.3d 302].) A statement made by defendant after the jury rendered its verdict would not be evidence presented at the penalty phase, and therefore the trial court could not consider it in ruling on the modification motion.

### E. *Automatic Motion to Modify Penalty Verdict*

The trial court denied defendant's automatic motion to modify the jury's verdict of death. (§ 190.4, subd. (e).) In response to the argument of defense counsel, the trial court stated that it would consider the aggravating and mitigating factors in this case and not compare this case to other cases in which the death penalty was not imposed. The court then said that the "sad fact for your client is that there is no mitigation, with one exception that the court can see and that is his age. [¶] I will give him that. [¶] 19, you are right. [¶] If you were my age at age 19, you would have needed my parents'

permission to do almost everything. [¶] I was clueless as to almost everything and most 19 year olds are. [¶] But things have changed and you see a situation now where people 14, 15, 16, 18, et cetera, have evolved into predators at a very young age for whatever reason. And Mr. Romero [defendant] clearly fits into the category." The court then discussed the severity of defendant's crimes, including the murders and the assaults committed by defendant, stating that the "mitigation is quite insubstantial given the gravity of the crime." The court concluded with the statement that the jury's finding was amply justified by the record, that the "mitigation is insubstantial," the "aggravation great," and that defendant "deserves what [the jury] came up with as far as the court can see, 19 or not."

Defendant contends the trial court violated his state and federal constitutional rights to due process, to present a defense, to a penalty determination based on all available mitigating evidence, and to a reliable penalty determination by committing a number of errors in denying his automatic motion to modify. We disagree.

 Defendant argues the trial court violated section 190.4, subdivision (e) by failing to reweigh mitigating evidence and erroneously finding no mitigating factors except defendant's age of 19 years. The record, however, shows that the trial court did reweigh the mitigating evidence. The court mentioned that the mitigation evidence was insubstantial and explained why it did not consider defendant's age alone as sufficient mitigation to warrant modification of the death verdict. In ruling on an automatic motion to modify a death verdict, a trial court need not recount details of, or identify, all evidence presented in mitigation or in aggravation. (*People v. Samayoa* (1997) 15 Cal.4th 795, 860 [64 Cal.Rptr.2d 400, 938 P.2d 2].) The trial court's only obligation was to provide a ruling that allows effective appellate review. (*People v. Arias* (1996) 13 Cal.4th 92, 191–192 [51 Cal.Rptr.2d 770, 913 P.2d 980].) The trial court here did: It identified what it viewed as mitigating and aggravating evidence of significance to its ruling, and it engaged in the requisite weighing.

Defendant next asserts that in denying the automatic motion to modify, the trial court engaged in intercase proportionality review in a manner that was arbitrary and irrational. He argues that the court both refused to undertake intercase proportionality review by considering sentences in other capital cases and considered intercase proportionality review by identifying defendant as being within the group of people 14 to 18 years of age that have "evolved into predators . . . ." Not so. The trial court's reference to changing attitudes and conduct of youth was not a comparison to other potential capital cases. There was no irrationality or arbitrariness in the trial court's comments.

 Finally, defendant contends the trial court improperly deferred to the jury's verdict instead of exercising its independent judgment. Defendant misapprehends the nature of the trial court's role in ruling on such a motion. In ruling on a capital defendant's automatic motion to modify the jury's verdict of death, the " 'trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict.' " (*People v. Weaver, supra,* 26 Cal.4th at pp. 989–990.) Here, the trial court did independently reweigh the mitigating and aggravating evidence. The court commented on what it viewed as mitigating and aggravating evidence of significance and independently re-weighed that evidence, concluding that the weight of the evidence supported the jury's verdict of death.

### F. *Challenges to Death Penalty Law*

Defendant challenges the constitutional validity of California's death penalty law on various grounds. We have in prior decisions rejected similar challenges, and again do so here.

The death penalty law is not unconstitutional for failing to adequately distinguish the cases in which death is imposed from the cases in which it is not. (*People v. Kennedy, supra,* 36 Cal.4th at pp. 639–640; *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

The sentencing factor allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not result in the arbitrary or capricious imposition of the death penalty. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.)

There is no constitutional right to conduct sequestered, individual voir dire of prospective jurors. (*People v. Box* (2000) 23 Cal.4th 1153, 1178–1182 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

The jury at the penalty phase "need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and [the] standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination." (*People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d

568].) At the penalty phase, the trial court need not and should not instruct the jury on the burden of proof. (*People v. Panah* (2005) 35 Cal.4th 395, 499 [25 Cal.Rptr.3d 672, 107 P.3d 790].) It is sufficient that the jury be instructed, as it was here, that to return a verdict of death each member of the jury " 'must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' " (*People v. Box, supra,* 23 Cal.4th at p. 1216.) It is not unconstitutional to allow the jury to consider unadjudicated criminal activity (§ 190.3, factor (b)) and doing so does not make the sentence unreliable. (*People v. Morrison, supra,* 34 Cal.4th at p. 729; *People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450].) The United States Supreme Court's decisions in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], do not affect or change these conclusions. (*People v. Prince* (2007) 40 Cal.4th 1179, 1297–1298 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

The use of the adjectives "extreme" and "substantial" do not make the sentencing statute (§ 190.3) or instructions unconstitutional. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.)

The federal Constitution does not require intercase proportionality review. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.) The absence of disparate sentence review does not deny a defendant the constitutional right to equal protection. (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

Sentencing factors are not constitutionally required to be identified as aggravating or mitigating. (*People v. Earp* (1999) 20 Cal.4th 826, 898 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

We have repeatedly rejected the claim that the death penalty is unconstitutional on the ground it violates international norms. (*People v. Panah, supra,* 35 Cal.4th at pp. 500–501; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) We do so again here.

### G. *Cumulative Effect of Alleged Errors*

Defendant contends the cumulative effect of the errors he asserts occurred at trial was prejudicial. We disagree. We have found only minor errors in this case. Careful review of the record convinces us that the trial was fair and the jury's decision reliable.

## CONCLUSION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 20, 2008.