Filed 7/31/14  P. v. Lawson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D064376 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD245566) |
| NICHOLAS S. LAWSON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed as modified.

Beatrice C. Tillman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Nicholas S. Lawson of assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1); misdemeanor battery (§ 242; count 2); conspiracy to commit assault by means of force likely to produce great bodily injury (§ 182, subd. (a)(1); count 3); and conspiracy to commit battery (§ 182, subd. (a)(1); count 4). Lawson admitted he had suffered two prior strike convictions (§ 667, subds. (b)-(i)) and one prior prison term conviction (§ 667.5, subd. (b)).

The court sentenced Lawson to prison for eight years four months, consisting of six years for count 1, a concurrent term of three years for the conspiracy to commit the felony assault in count 3, a consecutive term of one year four months for the conspiracy to commit battery in count 4, and one year for the prison prior. The court awarded Lawson credit for time served for count 2.

Lawson appeals, contending: (1) his Sixth Amendment rights were violated because the court admitted certain out-of-court statements of one of the alleged victims; (2) the court erred in failing to sua sponte instruct the jury that it must determine whether the multiple conspiracies charged in counts 3 and 4 were part of an all-inclusive plan with a single objective; and (3) the concurrent sentence on count 3 should be stayed under section 654. Only Lawson's challenge to the sentence for count 3 has merit. Accordingly, we affirm the judgment as modified to stay Lawson's sentence under count 3.

---

[1]      Statutory references are to the Penal Code unless otherwise specified.

FACTS

The crimes in this case occurred in one of five two-story modules in the San Diego County jail. The subject module has a common area or day room with tables and a television on the first floor and two floors of inmate cells along part of the perimeter of the day room. There is a deputy's station with windows on the first floor of the jail, in the center of the five modules. The jail also has a video surveillance system on every housing floor. Lawson's crimes were captured on the video surveillance system. At trial, the prosecutor presented the video, which did not have an audio portion, and still shots from the video.

Around 10:00 a.m., Yorik Hancock, Michael Ottinger, and Joshua George were eating lunch at a table in the day room while Lawson, dressed in all blue, stood by the doorway of his cell. At one point, Hancock left the table, went to one cell and then went to Luis Gautier's cell on the upper level. Hancock stayed in Gautier's cell for "just a little bit." He then returned to the table where he joined Ottinger and Lawson.

Lawson returned to his cell and later exited it with his cellmate, Arden Montalvo. Lawson walked over to George and tapped him on the shoulder. Lawson and Montalvo then returned to their cell with George while Hancock paced outside his nearby cell. Shortly after this, Ottinger entered Lawson's cell and punched George on the right side of head, knocking him to the ground. Lawson and Montalvo picked George up and moved him outside their cell.

Lawson then walked upstairs and entered Gautier's cell, followed by Montalvo and Hancock. Although the surveillance camera view of Gautier's cell was obstructed in

3

large part by a pillar, two men dressed in white shirts and one in blue are visible on the video. The video shows movements and punching and kicking motions in the cell. After about a minute, Lawson, Montalvo, and Hancock exited Gautier's cell and returned to their own cells. Lawson then conversed with George in the day room where they were joined at one point by Ottinger. Later, Gautier exited his cell, walked to the showers, and showered. Gautier then gathered his mattress, sheets and bedding and, around 10:45 a.m., banged on the module door. Deputy Sheriff Pedro Lopez heard the banging, looked at the door, and saw Gautier with his belongings rolled up in his mattress. Lopez noticed bruises, swelling, and blood on Gautier's face and blood and cuts on his ears. Lopez had seen Gautier earlier that morning and did not notice any injuries on his face. After the tower deputy opened the module door, Lopez asked Gautier what happened. Gautier responded that he needed to leave the module and could not be there. Gautier also said that he had been attacked by five men in his cell, he could not identify the men because he covered his face during the attack, and even if he did know who had attacked him, he would not tell Lopez.

After Lopez reviewed the surveillance videotape, he contacted Lawson, Hancock, and Montalvo. None of them had any visible injuries. The parties stipulated that 16 days before this incident, Gautier sustained an orbital fracture, nasal fracture, and bruising when, according to Gautier, he was struck multiple times by several inmates in the face, back, and ribs. The parties further stipulated that Gautier had sustained a conviction in 2010 for assault with a deadly weapon or by means of force likely to produce great bodily injury.

4

Deputy Sheriff John Barrios, a 22-year veteran who has spent his entire career working in jail or correctional settings, testified that there is a specific culture and code of conduct in jail. Barrios explained that inmates separate themselves according to race and will only room, eat, and socialize with members of their own race. If an inmate violates the jail code, the inmate will suffer consequences. Victims and witnesses to crimes in the jail setting are reluctant to cooperate with investigations and to testify because they will be attacked by members of their own race if they do so. Informants or "snitches" typically end up in protective custody. Barrios acknowledged that jail fights are common and may result from reasons unrelated to race, like disputes over food, water, the condition of the showers, and issues outside of jail.

## DISCUSSION

## I

### *THE ADMISSION OF GAUTIER'S STATEMENTS*

Lawson contends the trial court prejudicially erred and violated his Sixth Amendment right to confrontation by admitting Gautier's statement to Lopez after the assault. We disagree.

The prosecution filed a motion in limine to admit certain statements Gautier made to Lopez after Gautier was assaulted. According to the motion:

> "Gautier, showered after his attack, then rolled up his mattress and belongings and went to the deputy's station to report the attack. Gautier told Deputy Pedro Lopez that . . . while housed at George Bailey Detention Facility, the 'shotcaller' of Gautier's module requested to see Gautier's court paperwork. Gautier told the 'shotcaller' that he did not have paperwork. The following day . . . Gautier along with another inmate were transferred from the module

5

> in George Bailey, to the fifth floor module B of the San Diego
> Central Jail. The inmate who was transferred along with Gautier
> asked Gautier to see his court paperwork once again . . . . Gautier
> would only identify this inmate as 'one of the white guys.' Gautier
> said that he was in his cell by himself a little while later when
> approximately five guys entered his cell and started to beat him.
> Gautier refused to identify any of his attackers and said, 'I don't care
> who did it, I don't want to prosecute or testify against anyone.' "

The prosecution argued each of Gautier's statements to Lopez was admissible as a spontaneous utterance or contemporaneous statement.

At the hearing on the motion in limine, the court indicated that the statements did not qualify as spontaneous utterances because Gautier had showered in between the attack and the statements and was not seriously injured in the attack. The prosecution stated it was only seeking to introduce "the fact that Gautier did come and report that he had been attacked and that he did say, 'I don't care who did it. I don't want to testify or prosecute against anyone.' " The prosecution argued these last two statements showed Gautier's state of mind and fear associated with the attack. The prosecution also contended the statements were not testimonial within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) because they were analogous to a 911 call requesting help.

Lawson's counsel disagreed, arguing Gautier did more than request help in his statements. The court ruled the statements were nontestimonial and admissible as fresh complaints. The court further ruled that Lawson's counsel could introduce the reason why Gautier could not identify his attackers, i.e., Gautier was covering his face during the attack.

At trial, Lopez testified about Gautier's statements to him after the assault:

"Q:    What happened after you had the deputy roll the door for inmate Gautier?

"A:    Well, right -- right away I noticed he had bruising and he was bleeding from his face. And I asked him what happened, and he just told me he needed to get out of that module because he couldn't be in there. And I informed him that he was going to be taken to the third floor to be seen by medical.

"Q:    Okay. Did Mr. Gautier report to you that he had been attacked?

"A:    He told me that he was attacked inside of his cell.

"Q:    Was inmate Gautier able to identify who attacked him?

"A:    I asked him if he would, and he told me no.

"Q:    And when you say he told you no, did he tell you he could not identify who attacked him or he didn't want to?

"A:    He said -- he told me that he didn't want -- he couldn't identify who did it and that, if he did know who it was, he wasn't going to tell me.

"Q:    Was inmate Gautier cooperative with your attempts to investigate this?

"A:    Yeah, he was cooperative.

"Q:    Was he cooperative with your attempts to identify who his attackers were?

"A:    He – he wouldn't – he wouldn't tell me. All he told me was: I don't want to -- I don't want to tell them who did it. [¶] That's it.

"Q:    Did he tell you whether he wanted charges pressed?

"A:    He told me he didn't want any charges pressed."

7

On cross-examination, Lopez admitted that Gautier told him he had been attacked by five inmates. Also, Lopez testified that Gautier told him that he could not identify his attackers because he was covering his face during the attack.

Here, Lawson contends Gautier's statements to Lopez were hearsay, not subject to any exception to the hearsay rule. And, he further asserts the admission of those statements into evidence violated the confrontation clause of the United States Constitution because they were testimonial in nature and Lawson was not able to cross-examine Gautier, who did not appear at trial as a witness. (See *California v. Green* (1970) 399 U.S. 149, 158.)

In response, the People do not address Lawson's arguments about the admissibility of the statements, but instead, maintain Lawson suffered no prejudice.

The Sixth Amendment of the federal Constitution provides that a defendant has the right to confront the witnesses against him. In *Crawford*, the United States Supreme Court held that admission of a "testimonial" hearsay statement by a declarant who does not appear for cross-examination at trial violates the confrontation clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. (*Crawford*, *supra*, 541 U.S. at pp. 59, 68.) This rule applies even if the statement is otherwise admissible under a hearsay exception. (*Id*. at pp. 50-51, 56 & fn. 7.) However, the confrontation clause does not bar admission of hearsay statements that are not testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 823-826 (*Davis*).)

Relevant to the parameters of testimonial statements to which the confrontation clause applies, the court in *Crawford, supra,* 541 U.S. 36 explained: "[T]he

8

Confrontation Clause . . . applies to 'witnesses' against the accused--in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* at p. 51.)

However, not all statements to government officers are testimonial. In *Davis*, the court formulated the following test to distinguish nontestimonial from testimonial statements made to law enforcement officials: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822.)

The court in *Davis* reasoned that statements to government officials that are "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" satisfy the definition of a testimonial statement because they are a solemn declaration or affirmation made for the purpose of establishing or proving some fact. (*Davis*, *supra*, 547 U.S. at p. 826.) Further, a witness's description of past events to an investigating officer may be testimonial regardless of whether the statements were reduced to a writing signed by the declarant or merely embedded in the memory or notes of the officer. (*Ibid*.) The court in *Davis* acknowledged that "formality

9

is indeed essential to testimonial utterance" (*id.* at p. 830, fn. 5), but stated the requisite formality and solemnity exist when a witness describes past events to an officer, because deliberate falsehoods to officers constitute a criminal offense. (*Id.* at pp. 826-827.) The court also observed that statements are not automatically nontestimonial even when they were made without any detailed interrogation (i.e., volunteered statements or answers to open-ended questions). (*Id.* at p. 822, fn. 1.)

Under these principles, statements made to a 911 operator describing events as they are actually happening are not testimonial if their purpose was to provide the police with information necessary to resolve a present emergency and they were made in an environment that was not tranquil or safe. (*Davis*, *supra*, 547 U.S. at p. 827.) In this circumstance, the 911 caller's statements are not " 'a weaker substitute for live testimony' at trial" because "[n]o 'witness' goes into court to proclaim an emergency and seek help." (*Id.* at p. 828; see *People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*) [testimonial statements are statements that are "out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial"].)

Similarly, statements in response to police inquiries at the crime scene are not testimonial if the inquiries were designed to ascertain whether there was an ongoing threat to the safety of the victim, the officers, or the public. (See *Davis*, *supra*, 547 U.S. at pp. 829, 831-832; *People v. Romero* (2008) 44 Cal.4th 386, 422 (*Romero*).) For example, questioning a victim to identify a perpetrator for purposes of immediate apprehension of the perpetrator for safety reasons does not yield a testimonial statement. (*Ibid.* [statements "are nontestimonial if the primary purpose is to deal with a

10

contemporaneous emergency such as assessing the situation, dealing with threats, or apprehending a perpetrator"].)

In *Romero*, *supra*, 44 Cal.4th 386 the court concluded a victim's statements to the police at the crime scene were nontestimonial under circumstances where the agitated victim described an assault that had just occurred, and a few minutes later identified the perpetrators whom the police found hiding nearby. (*Id*. at pp. 421-422.) The court reasoned the "statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. . . . The primary purpose of the police in asking [the victim] to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Id*. at p. 422.)

In contrast, statements that are initially nontestimonial may evolve into testimonial statements if the immediate danger has ended and the questioning continues to elicit details about what happened. (See *Davis*, *supra*, 547 U.S. at pp. 817, 828-829 [following initial nontestimonial statements, 911 caller's statements may have become testimonial once the caller reported that the assailant (her former boyfriend) had driven away and the operator "proceeded to pose a battery of questions"].) Likewise, statements are testimonial if they are in response to police interrogation that occurs after the emergency

11

has been resolved and where there is no immediate need to identify or apprehend a perpetrator. (See *Davis*, *supra*, 547 U.S. at pp. 829-830.)

For example, the court in *Davis* found statements made to an officer responding to a report of a domestic disturbance were testimonial because there were no signs of a current disturbance; the wife stated she was fine; the wife made statements incriminating her husband only during a second conversation when she was interviewed in a room separate from her husband and sometime after the events she described were over; and the officer had the wife write out an affidavit to establish what had occurred previously. (*Davis*, *supra*, 547 U.S. at pp. 829-832.) The court reasoned that during the second conversation the officer was not seeking information about " 'what is happening' " but rather about " 'what happened' "; the victim was not making a "cry for help" and was not providing information to enable the officers "immediately to end a threatening situation"; and the sole purpose of the interrogation was to investigate a possible crime. (*Id*. at pp. 830-832.) The court concluded the statements are "an obvious substitute for live testimony, because they do precisely what a witness does on direct examination . . . ." (*Id*. at p. 830; italics omitted.)

Similarly, in *Cage*, *supra*, 40 Cal.4th 965, the California Supreme Court concluded a victim's statement to an officer at a hospital waiting room was testimonial under circumstances where the officer had earlier been to the scene of the crime and observed evidence that could suggest the defendant (the victim's mother) had committed an assault; the victim had been transported to the hospital and was awaiting treatment in the emergency room; and the officer asked the victim to describe what had happened

12

between the victim and the defendant. (*Id.* at pp. 984-985.) The court reasoned that by the time the officer spoke with the victim the incident had been over for more than an hour; the assailant and the victim were geographically separated; and the victim was "in no danger of further violence as to which contemporaneous police intervention might be required." (*Id.* at p. 985.)

The court concluded the officer's "clear purpose in coming to speak to [the victim] at this juncture was not to deal with a present emergency, but to obtain a fresh account of past events involving defendant as part of an inquiry into possible criminal activity." (*Cage*, *supra*, 40 Cal.4th at p. 985; italics omitted.) Rejecting an argument that the officer was determining whether further immediate police action might be necessary to apprehend a perpetrator, the court noted the officer did not try to obtain emergency information from the victim when he saw him near the crime scene even though the victim was coherent; at the hospital the officer questioned the victim in a manner that assumed the defendant was the suspect; and there was no indication the officer followed up with what the victim told him by initiating emergency action. (*Id.* at pp. 985-986, fn. 15.)

On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1478.) We evaluate the primary purpose for which the statement was given and taken under an objective standard, "considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Cage*, *supra*, 40 Cal.4th at p. 984.)

13

Here, Gautier's initial statements to Lopez that he needed out of the module because he had been attacked are nontestimonial. In making these statements, Gautier was clearly making a cry for help. (See *Romero*, *supra*, 44 Cal.4th at p. 422.) He was asking to be removed from a location (the module) because he was not safe (he was attacked). Further, the length of time between the attack and Gautier's statements to Lopez (15 minutes) does not necessarily undermine the conclusion that Gautier's initial statements were nontestimonial. Although Gautier cleaned himself up after the assault and gathered his possessions before asking to leave the module, the fact that he asked to leave the module made clear that he did not feel safe and was concerned that he could be in danger. Lopez's willingness to remove Gautier from the module also indicated that he believed Gautier was in danger if he remained in the module. The trial court did not err in admitting these statements.

However, Gautier's statements following his initial two statements cross the line from nontestimonial to testimonial. These statements consist of Gautier telling Lopez that he could not identify his attackers; even if he could identify his attackers, he would not do so; and he did not want to prosecute his attackers. None of these statements were necessary to allow Lopez to ascertain whether there was an ongoing threat to Gautier's safety. (See *Davis*, *supra*, 547 U.S. at pp. 829, 831-832; *Romero*, *supra*, 44 Cal.4th at p. 422.) These statements were more akin to a victim responding to a police officer's questions to allow that officer to obtain a "fresh account of past events . . . as part of an inquiry into possible criminal activity." (*Cage*, *supra*, 40 Cal.4th at p. 985; italics omitted.) As such, we conclude the trial court erred in admitting these statements.

14

Having concluded that error occurred, we must evaluate whether the error was prejudicial under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

Lawson argues he was prejudiced by the admission of the statements because the statements bolstered the prosecution's "spin" of what occurred in the video to support the conspiracy charges by providing circumstantial evidence of Lawson's intent. More specifically, he contends Gautier's statements supported the prosecution's story that Gautier would not testify at trial because he was a "snitch," who had just been attacked by members of his own race and was fearful of reprisals if he were to testify. We disagree.

At trial, the prosecution offered the testimony of Barrios, a jail culture expert, who explained that when someone is a victim of crime in jail, there is a reluctance to cooperate with investigations or to testify because "the inmates fear each other more than they -- and the consequences as a result of their actions more than they fear the deputies or the law or anything like that, because they have to live in that environment. They have no escape from it." However, Barrios also testified that inmates may attack each other for a variety of reasons, including a lunch related dispute, the condition in which a shower was left, or some issue connected to what was occurring outside the jail. In addition, Barrios admitted that he had no information that Gautier was refusing to testify in this case.

Also, during closing argument, the prosecution argued it did not have to prove Lawson's motive and emphasized that motive was not established in the case. As such, the prosecution did not argue to the jury that Gautier did not testify at trial because he

15

was worried that he would be labeled a snitch and would be subject to reprisals by Lawson and/or other inmates. Further, Lawson's counsel effectively cross-examined Lopez, getting him to admit that Gautier could not identify his attackers because he had covered his face during the attack.

In light of this record, we conclude that the admission of Gautier's later statements that he could not identify his attackers, would not identify his attackers, and did not want to press charges against his attackers were harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. 18. Instead of prejudicing Lawson, these statements highlighted the weakness in the prosecution's case: one of the victims could not identify his attackers.

## II

### *CONSPIRACY JURY INSTRUCTIONS*

Lawson was convicted of conspiracy to commit an assault on Gautier (count 3) and conspiracy to commit a battery on George (count 4). Here, the court instructed the jury that it needed to find separate agreements for both of the conspiracy charges. Specifically, the jurors were instructed that to find a conspiracy to commit felony assault, they had to find, among other elements, that "[t]he defendant intended to agree and did agree with Yorik Hancock, and/or Arden Montalvo, to commit Assault with Force Likely to Cause Great Bodily Injury." The jury was separately asked to determine for the conspiracy to commit battery whether "[t]he defendant intended to agree and did agree with Arden Montalvo, and/or Michael Ottinger to commit Battery." And the court instructed the jury to decide each count separately.

16

Lawson claims the court erred in giving these instructions because the court had a duty to sua sponte instruct the jury that it must determine whether both conspiracies constituted a single, all-inclusive conspiracy. We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid*.)

As a threshold issue, we note that Lawson did not request an instruction regarding whether a single conspiracy existed. By failing to request a specific jury instruction at trial, Lawson forfeited this claim on appeal, unless the claimed error affected Lawson's substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) Nevertheless, Lawson attempts to avoid forfeiture of this issue by maintaining the trial court had a sua sponte duty to give the additional single conspiracy instruction.

Lawson acknowledges that there is no California Supreme Court case on point. Moreover, he admits that the District Courts of Appeal are split regarding whether a trial court has a sua sponte duty to instruct the jury on single versus multiple conspiracies. (See, e.g., *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1668-1671 [duty to instruct]; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220-1223 [duty to instruct]; *People v. Liu*

17

(1996) 46 Cal.App.4th 1119, 1133 [no duty to instruct]; *People v. McLead* (1990) 225 Cal.App.3d 906, 921 [no duty to instruct].)  Lawson urges us to follow *Meneses* and *Jasso*, claiming "the evidence at trial established a single, ongoing, all-inclusive conspiracy by a group of inmates to control other inmates in their ethnic group through fear and force."  Lawson, however, fails to cite to this evidence in the record.  Instead, he relies on pretrial arguments by the prosecution and Lawson's statement in his probation report.  Neither is evidence that was before the jury during Lawson's trial.

Here, the battery and felony assault occurred close in time, by the same means in different cells in the same module.  But the evidence did not establish a motive for the attacks.  The prosecution's expert on jail culture testified that fights in jail are common and can occur for a variety of reasons.   During closing argument, the prosecutor acknowledged the dearth of evidence regarding the motive for the battery and assault: "Every fact in the case, every fact you've heard, doesn't need to be proven beyond a reasonable doubt.  There could be a dispute as to what they're eating as they're sitting at the table.  That's not a fact that's an element of the crimes here ladies and gentlemen.  That does not need to be proven.  [¶] . . . [¶]  People are not required to prove motive. . . . [¶]  Crimes happen for all kinds of reasons:  attacks, robberies, beatings.  These are things that happen for all types of reasons.  [¶] We don't need to prove why it happened; just that it happened and this defendant intended for it to happen, took part in the planning and actually participated."  On rebuttal, the prosecutor similarly acknowledged there was no evidence of a disagreement or argument between Lawson and either George or Gautier.  The prosecutor again reminded the jurors that he did not have to prove

18

motive. Thus, the evidence did not establish what the motives for the battery and assault were, let alone that they were committed with a common purpose.

Additionally, the attacks involved different combinations of conspirators, namely Lawson, Montalvo and Ottinger in the battery and Lawson, Montalvo and Hancock in the felony assault. Finally, the attacks involved different victims, George and Gautier. Therefore, the evidence did not support an alternative theory of a single conspiracy. The prosecution attempted to prove that Lawson entered into two separate conspiracies, and the court instructed the jury that it had to find these two separate conspiracies existed beyond a reasonable doubt. The prosecution did not argue Lawson's acts were part of a conspiracy to control other inmates. Nor did Lawson's counsel.

On this record, we need not weigh in on the appellate court split regarding the trial court's sua sponte duty to give a single versus multiple conspiracy jury instruction. The court properly instructed the jury. The jury found beyond a reasonable doubt that two conspiracies existed. No party requested a single conspiracy versus multiple conspiracies jury instruction. No party argued a single conspiracy existed. There was no error.

III

*SECTION 654*

Lawson maintains, and the People concede, the court should have stayed Lawson's sentence of a concurrent term of three years for the conspiracy to commit assault by a means of force likely to produce great bodily injury in count 3. "Section 654 prohibits multiple punishment for both the conspiracy and the substantive offenses that were its object." (*People v. Briones* (2008) 167 Cal.App.4th 524, 529.) Here, the assault in

19

count 1 and the conspiracy in count 3 were part of an indivisible course of conduct leading to a single objective:  assault of Gautier.  Therefore, the trial court should have stayed the concurrent sentence for count 3 under section 654.

DISPOSITION

This case is remanded to the trial court with directions to correct the judgment to stay Lawson's three-year prison sentence for count 3 (conspiracy to commit assault by means of force likely to produce great bodily injury) per section 654.  In all other respects, the judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.


20