Filed 7/18/23  P. v. Campa CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B317813 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. NA101408 |
| v. | |
| MARIO CAMPA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge. Reversed and remanded with directions.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Mario Campa of four counts of attempted willful, premeditated, and deliberate murder, with true findings as to each count that Campa committed the crime for the benefit of a gang and that a principal used a firearm causing great bodily injury. The court sentenced Campa to 80 years to life in prison. After we vacated Campa's sentence and remanded the matter for resentencing, the court reduced Campa's sentence to 30 years to life in prison.

After the court resentenced Campa, the California Legislature enacted Assembly Bill No. 333 (A.B. 333), which made substantive and procedural changes to the laws governing gang-related offenses. Campa contends his attempted murder convictions must be overturned and a new trial ordered because Penal Code[1] section 1109, as enacted by A.B. 333, allows him to request a bifurcated trial on the gang enhancements and he was prejudiced by a unitary trial. In the alternative, Campa contends that A.B. 333's amendments to section 186.22 require reversal of the true findings for the gang enhancements. We conclude that Campa is entitled to relief under A.B. 333's amendments to section 186.22, but he is not entitled to relief under section 1109. We therefore reverse the true findings for the gang enhancements, vacate Campa's sentence, and remand the matter for further proceedings consistent with this opinion.

---

[1] All undesignated statutory references are to the Penal Code.

# FACTUAL BACKGROUND[2]

## 1.    The Shootings

Kejion Robinson and Larry Hood, two Black men, were walking down 14th Street in Long Beach. As they walked past an alleyway, someone started shooting at them from inside a late-1990s green Toyota Camry. Robinson was struck by two bullets—one hitting his thigh and another hitting his foot—and Hood was struck by one bullet in the leg. Robinson saw the face of the person sitting in the front passenger seat before the Camry sped off.

A little more than an hour after Robinson and Hood were shot, Bryon Rodriguez and Edwin Alonzo were standing in front of a liquor store on Daisy Avenue in Long Beach. A man who was standing about 10 to 15 feet away started shooting at them. Rodriguez was struck by four bullets—two in the chest, one in the hand, and one in the arm—and Alonzo was struck by three bullets. According to Rodriguez, the shooter was wearing what looked like a hooded jacket. Rodriguez didn't see the shooter's face, however.

## 2.    The Investigation

Juan Zazueta (uncle) testified that Campa is his wife's nephew. The uncle's son—i.e., Campa's cousin—was a gang member. The uncle's son and Campa used to hang out.

Campa's uncle purchased a late 1990's green Toyota Camry the day before the shootings. Around 1:00 p.m. on the day of the shootings, the uncle left the car and its keys at his house while he

---

[2] The facts are taken from our prior nonpublished opinion in *People v. Campa* (Apr. 22, 2021, B289623) (*Campa I*).

went to church. When he returned from church several hours later, the uncle noticed the car was parked in a different position from when he left for church and that one of its hubcaps was missing.

License plate recognition technology used by the Long Beach Police Department showed that Campa's uncle's Camry was in the vicinity of the 14th Street shooting around the time Robinson and Hood were shot and near the Daisy Avenue liquor store around the time Rodriguez and Alonzo were shot. Footage obtained from a residence near the liquor store also showed the same car driving back and forth about four times on Daisy Avenue about an hour and a half before the liquor store shooting. Several hours after the shootings, Campa's uncle was stopped and arrested while driving the Camry.

The police recovered .45-caliber bullet casings from the scene of each shooting. A criminologist later determined that both sets of casings were fired from the same gun.

In February 2015, while in custody on unrelated charges, Campa was placed in a jail cell with an undercover informant. At the time, Campa had yet to be identified as a suspect in the 14th Street and the Daisy Avenue liquor store shootings. Campa's conversation with the informant was recorded and played for the jury.

Campa told the informant he was a member of the East Side Longo gang, with the moniker "Baby Evil." After denying involvement in the unrelated charges, Campa told the informant that his cousin had recently been arrested in connection with the 14th Street and the Daisy Avenue liquor store shootings. Campa also told the informant that his uncle had been arrested while driving the Camry used in the shootings. Campa admitted he was

riding shotgun in his uncle's car while his cousin drove and three other people sat in the back passenger compartment. Using .45-caliber bullets, they shot at two "Tintos"[3] and "two fools from Barrio Pobre."[4]

When the informant asked where the two Black men were from, Campa responded, "I don't even know where the fuck they was from ... ." The informant followed up, "Just see black and fucking start shooting," to which Campa replied, "Yeah, yeah." Campa later told the informant, "That's the thing about me. I'll be in the car with a burner[5] and all that. I['m] ready to hop out on somebody like man I see somebody I'm hopping out right now."

About a week after Campa spoke to the informant, one of the investigators showed Robinson a six-pack photographic lineup containing Campa's photograph.[6] Robinson identified Campa as the shooter because his face was " 'unforgettable.' "

The police recovered security footage from the Daisy Avenue liquor store where the second shooting occurred. The footage showed a man wearing white shoes and a grey hooded sweatshirt with an emblem of the State of California across the front. As he walked toward the front of the liquor store, the man in the sweatshirt started shooting at Rodriguez and Alonzo. The

---

[3] Two of the People's investigators testified that "Tintos" is a derogatory term for Black men used by Hispanic gang members in Long Beach.

[4] Barrio Pobre is a Long Beach gang.

[5] One of the investigators testified that a "burner" is slang for a gun.

[6] Shortly after the shooting, the investigator showed Robinson a six-pack photographic lineup that did not include Campa's photograph. Robinson did not identify anyone in that lineup.

shooter's face wasn't identifiable from the security footage. The police later recovered a pair of white shoes and a grey hooded sweatshirt with an emblem of California across the front inside Campa's home.

One of the investigators spoke to a witness near the liquor store shooting. The witness told the investigator that, shortly before the shooting, someone in the green Camry asked two women who were walking down the street, "Where the Bean Pies at?" According to the investigator, " 'Bean Pie' " is a derogatory term for members of the Barrio Pobre gang in Long Beach.

### 3.    Gang Evidence

The People's gang expert testified that Campa is a member of East Side Longo, a Long Beach gang that claims territory on the east side of the 710 freeway. Campa has several tattoos of symbols associated with the gang. East Side Longo is the largest gang in Long Beach, with about 900 members.

The gang expert has spent the "bulk" of his 16-year career in law enforcement investigating and studying gang activity. He's had conversations with numerous gang members in Long Beach, the vast majority of which were consensual and non-hostile interactions.

The expert became familiar with East Side Longo during his training at the academy for the Long Beach Police Department. Since then, the expert has interviewed East Side Longo members as well as more senior officers who have "worked the gang." Throughout his career, the expert has investigated crimes committed by, and testified in trials involving, East Side Longo members. Specifically, the expert has testified in 25 to 50 cases "specific to Eastside Longo." The expert stays current with the gang's activities, rivalries, and territorial disputes by talking

with members of the gang, members of rival gangs, other law enforcement officers, and members of the community. According to the expert, East Side Longo's primary criminal activities include: narcotics sales; violent assaults with firearms and other deadly weapons; illegal possession of firearms; attempted murder; and murder.

East Side Longo's rival gangs include Barrio Pobre and Barrio Small Town, who each claim territory that is also claimed by East Side Longo. East Side Longo is also rivals with all the Black gangs in the city, and East Side Longo members will often attack Black men, regardless of whether they're in a gang, without provocation.

The 14th Street and the Daisy Avenue liquor store shootings occurred in East Side Longo territory. The Daisy Avenue liquor store was in an area over which East Side Longo, Barrio Pobre, and Barrio Small Town dispute ownership. According to one of the investigators, a member of Barrio Small Town had put up graffiti of the gang's tag near the liquor store, which had been crossed out by a member of another gang.

The prosecutor posed a hypothetical based on the facts of this case. Based on that hypothetical, the gang expert opined that the shootings were committed at the direction of, and to promote, East Side Longo. Specifically, the shootings benefitted the gang by instilling fear in the community, which in turn would help the gang maintain its territory.

The People also introduced the certified conviction records of two East Side Longo members. One of the gang's members was convicted of committing a murder in East Side Longo territory. The other member was convicted of murdering a member of

Barrio Pobre in East Side Longo territory. According to the gang expert, both crimes benefitted East Side Longo.

## PROCEDURAL BACKGROUND

The People charged Campa with four counts of attempted willful, premeditated, and deliberate murder (§§ 664/187, subd. (a)). As to each count, the People alleged Campa committed the crime for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). The People also alleged gang-related firearm enhancements as to each count (§ 12022.53, subds. (b), (c), (d), & (e)).

The jury found Campa guilty of all four counts of attempted murder. As to each count, the jury found the attempted murders were willful, deliberate, and premeditated and that a principal personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)). The jury also found true the gang enhancement allegation as to each count.

The court sentenced Campa to a total of 80 years to life in prison. As to count 1, the court imposed a total term of 40 years to life, consisting of 15 years to life for attempted murder committed for the benefit of a gang under section 186.22, subdivision (b)(5), plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). As to count 2, the court imposed the same total term of 40 years to life, to run consecutively to Campa's sentence for count 1. For each of counts 3 and 4, the court imposed a term of 40 years to life to run concurrently with Campa's sentence for counts 1 and 2. As to each count the court also imposed but stayed a 10-year term under section 186.22, subdivision (b)(1)(C).

In *Campa I*, we affirmed Campa's convictions but vacated his sentence because the court imposed an unauthorized

sentence. Specifically, we concluded the court erred when it imposed both the 25-years-to-life gun enhancement under section 12022.53, subdivisions (d) and (e)(1) and the 15-years-to-life gang enhancement under section 186.22, subdivision (b)(5), even though the jury never found Campa personally used or discharged a firearm. We remanded the matter for resentencing.

The court resentenced Campa in December 2021. As to each count, the court stayed the gun enhancement and imposed the 15-years-to-life gang enhancement. The court sentenced Campa to a reduced term of 30-years to life, consisting of consecutive 15-years-to-life terms for counts 1 and 2 and concurrent 15-years-to-life terms for counts 3 and 4.

On January 1, 2022, A.B. 333 went into effect. The legislation added section 1109, which requires the trial court to bifurcate the trial on gang enhancements from the trial on the substantive charges if the defendant makes such a request. (§ 1109, subds. (a) & (b); Stats. 2021, ch. 699, § 5.) A.B. 333 also amended section 186.22's requirements for proving gang enhancements. (See *People v. Renteria* (2022) 13 Cal.5th 951, 961.)

Campa appeals.

## DISCUSSION

Campa contends his attempted murder convictions and the true findings for the gang enhancements must be reversed because of A.B. 333's changes to the laws governing gang-related offenses and enhancements. As we explain, Campa is entitled to relief under A.B. 333's amendments to section 186.22, but he is not entitled to relief under section 1109. We therefore reverse the true findings, vacate Campa's sentence, and remand the matter

9

to give the People the opportunity to retry the gang enhancements.

**1.     Section 1109**

Campa contends we must reverse the attempted murder convictions and the gang enhancements because section 1109's bifurcation requirement applies to nonfinal convictions like his, and he was prejudiced by the court's failure to bifurcate the trial on the gang enhancements. We disagree.

Under section 1109, the trial court must bifurcate the trial on gang enhancements from the trial on the substantive offenses if the defendant requests bifurcation. (§ 1109, subds. (a) & (b); Stats. 2021, ch. 699, § 5.) If the charges are bifurcated, the court should try the gang enhancements only if the defendant is found guilty of the underlying offenses. (§ 1109, subd. (a)(2).)

There is a split of authority on the question of whether section 1109 applies retroactively to nonfinal convictions, and the issue is currently pending before the California Supreme Court. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*); see also *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090.) In *Perez*, this Division held that section 1109 is not retroactive because it "is a procedural statute that ensures a jury will not be prejudiced by the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed." (*Perez*, at p. 207.) Other courts, however, have held the statute is retroactive because it is designed to reduce the number of wrongful convictions and "mitigate punishment resulting from the admission of irrelevant gang evidence at trial." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129 (*Ramos*); see also *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–568, review granted July 13, 2022,

10

S274743.) We need not determine whether section 1109 is retroactive because any purported error in failing to bifurcate the trial on the gang enhancements was harmless. (See *Tran*, *supra*, 13 Cal.5th at p. 1208 [a trial court's failure to bifurcate trial of gang allegations under section 1109 is subject to harmless error analysis].)

Initially, we reject Campa's contention that the *Chapman*[7] harmless error standard for federal constitutional error applies to this case. The erroneous admission of evidence, including gang-related evidence, does not violate a defendant's federal due process rights unless that evidence renders the trial fundamentally unfair. (*Tran*, *supra*, 13 Cal.5th at p. 1209.) Most of the gang-related evidence in this case was relevant to prove the underlying offenses and would have been admissible at a bifurcated trial on those charges. As our Supreme Court has explained, "[e]vidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Consistent with *Hernandez*, the court instructed the jury that it could consider the gang-related evidence to determine whether Campa "acted with the intent, purpose, and knowledge that are required to prove the gang-related *crimes* and enhancements" and whether he "had a motive to commit the crimes charged." (Italics added.) And Campa acknowledges that the People relied heavily on gang-

---

[7] *Chapman v. California* (1967) 386 U.S. 18

11

related evidence to connect him to the underlying attempted murders and to prove that he premeditated in committing those crimes. Thus, to the extent the court admitted gang-related evidence that was not relevant to proving the substantive offenses, the admission of such evidence did not render Campa's trial on the substantive offenses fundamentally unfair. (*Tran, supra*, 13 Cal.5th at p. 1209; see also *Ramos, supra*, 77 Cal.App.5th at p. 1132 ["nothing in [A.B.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].)

Accordingly, the *Watson*[8] state-law harmless error standard applies here. Under that standard, Campa hasn't shown it is reasonably probable he would have obtained a more favorable verdict had the court bifurcated the trial on the gang enhancements. (*Tran, supra*, 13 Cal.5th at p. 1209.) As we just explained, most of the gang-related evidence was relevant to prove the attempted murder charges, so the jury still would have heard that evidence at a separate trial on the substantive offenses. (See *Hernandez, supra*, 33 Cal.4th at p. 1049.) That evidence, along with the nongang-related evidence, overwhelmingly establishes Campa's guilt on the attempted murder charges.

Campa is a member of East Side Longo—a Hispanic gang based in Long Beach. Campa admitted he shot at Rodriguez and Alonzo outside the Daisy Avenue liquor store because he believed they were "two fools from Barrio Pobre"—i.e., members of one of East Side Longo's rival gangs. The People's gang expert testified that the liquor store was in territory over which East Side Longo

---

[8] *People v. Watson* (1956) 46 Cal.2d 818

and Barrio Pobre disputed control, and that members of East Side Longo will often attack people in that territory whom they believe to be members of Barrio Pobre. Campa also admitted that he shot at Robinson and Hood because they were "Tintos"—i.e., a derogatory term for Black men used by Hispanic gang members in Long Beach. According to the gang expert, members of East Side Longo will often shoot at Black men simply because of their race, regardless of whether they are gang members or otherwise provoke members of East Side Longo.

As Campa acknowledges, the People relied on this evidence to prove not only the gang enhancements but also Campa's motive for shooting at the victims and that Campa premeditated and deliberated before he shot at them. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 [evidence of planning activity and motive are relevant to prove premeditation].) Thus, even had the court bifurcated the trial on the gang enhancements, the gang-related evidence would have played a large role in setting up the state's theory that Campa was guilty of premeditated and deliberate attempted murder. (See *Hernandez, supra*, 33 Cal.4th at p. 1049.)

There also was strong evidence of Campa's guilt independent of the gang-related evidence. Campa admitted he was riding in the passenger seat of his uncle's car when he shot at the victims. Campa confirmed he shot Robinson and Hood because they were Black, which is evidence of motive that supports a finding that Campa premeditated even without the gang expert's opinion that the shooting was gang-related. Campa also claimed he was carrying a gun with him in the car so he could be "ready to hop out on somebody." (See *People v. Romero, supra*, 44 Cal.4th at p. 401.)

Other evidence corroborated Campa's admissions. The police obtained video footage of the same type of car Campa admitted using during the shootings—i.e., a green Camry—driving back and forth in front of the Daisy Avenue liquor store before Campa shot at Rodriguez and Alonzo. Additionally, Robinson and Hood told the police that the person who shot at them was riding in a green Camry. And Robinson confirmed that Campa was the shooter, telling the police that Campa's face was " 'unforgettable.' " The police also found inside Campa's home a pair of white shoes and a grey hooded sweatshirt bearing an emblem of California, all of which matched the clothes worn by the person who shot at Alonzo and Rodriguez outside the Daisy Avenue liquor store.

Campa argues the court would have excluded from a bifurcated trial on the substantive offenses the hearsay statement from an unidentified witness that someone in the green Camry asked "where the Bean Pie is at" before the Daisy Avenue liquor store shooting. The People conceded in *Campa I* that the court erred in admitting that statement because it was testimonial hearsay that violated Campa's confrontation rights. But we concluded that the admission of that statement was harmless beyond a reasonable doubt because there was other properly admitted evidence that overwhelmingly established Campa's guilt for the attempted murder charges. That is still true for all the reasons we just discussed. Thus, Campa can't show it is reasonably probable he would have obtained a more favorable verdict had the "Bean Pie" statement been excluded from a separate trial on the substantive offenses because of its gang-related nature.

14

Campa also contends the court would have excluded evidence about gang tattoos and East Side Longo's predicate offenses because such evidence was not relevant to proving the attempted murder charges. Even if Campa is correct, it is not reasonably likely that he would have received a more favorable outcome if such evidence had been excluded at a separate trial on the substantive offenses.

As an initial matter, we note the court instructed the jury that it could not use gang-related evidence to conclude that Campa "is a person of bad character or that he has a disposition to commit crime." Thus, to the extent evidence of gang tattoos and East Side Longo's predicate offenses was not relevant to prove the substantive offenses, we presume the jury understood and followed the court's instructions not to use such evidence to find Campa committed the attempted murders. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In any event, neither the evidence of the predicate offenses nor the evidence of gang tattoos was unduly inflammatory or prejudicial. While both predicate offenses were murder convictions, the gang expert didn't testify in significant detail about either crime. The expert confirmed the suspects' names and when the crimes were committed. The expert also offered opinions as to why the suspects were members of East Side Longo and why the crimes benefitted that gang. The expert's testimony on the predicate offenses was brief, spanning only three pages of the reporter's transcript. Importantly, the expert didn't testify or otherwise imply that Campa was involved in the commission of either predicate offense.

As for the evidence of gang tattoos, one purpose of such evidence was to prove Campa's membership in East Side Longo, a

15

fact that, as we explained above, was relevant to prove the attempted murder charges. In any event, Campa fails to explain how any gang tattoo evidence was inflammatory or prejudicial such that it is reasonably probable he would have received a more favorable verdict had such evidence been excluded in a separate trial on his substantive offenses. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1190–1191 [the *Watson* standard "requires a defendant to show that without the error a more favorable outcome was reasonably probable"].)

In short, even if we were to assume section 1109 applies retroactively to Campa's convictions, the failure to bifurcate the trial on the gang enhancements was not prejudicial.

## 2. Section 186.22

A.B. 333 also amended section 186.22, changing the evidentiary showing necessary to impose gang enhancements. Specifically, A.B. 333 "narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' " (*Tran, supra*, 13 Cal.5th at p. 1206; § 186.22, subd. (f).) The People now must prove that the gang's members collectively engaged in a pattern of criminal activity. (*Tran*, at p. 1206; § 186.22, subd. (f).) It is no longer sufficient to show some of the gang's members individually engaged in such conduct. (*Tran,* at p. 1206.)

A.B. 333 also "narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses

16

establishing a pattern of gang activity must be ones other than the currently charged offense." (*Tran, supra,* 13 Cal.5th at p. 1206; § 186.22, subd. (e)(1), (2).) Additionally, A.B. 333 "narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*Tran,* at p. 1206; § 186.22, subd. (g).)

A.B. 333's amendments to section 186.22 apply retroactively to judgments that were not final when the changes went into effect. (*Tran, supra,* 13 Cal.5th at pp. 1206–1207.) Where, as here, the Legislature makes substantive changes to the elements of an offense and the jury is not instructed on those changes, "the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Id.* at p. 1207.)

The parties agree, and so do we, that A.B. 333's amendments to section 186.22 require reversal of the true findings for the gang enhancements. Because the jury was never instructed on the new elements in section 186.22, it was not required to find the most recent offense used to show a pattern of criminal gang activity occurred within three years of the date of the currently charged offense. (See § 186.22, subd. (g).) Indeed, as the People concede, both predicate offenses used to prove East Side Longo engaged in a pattern of criminal activity occurred in 2009, more than three years before the shootings charged in this case. We therefore cannot determine beyond a reasonable doubt that the jury would have found the gang allegations true had it been instructed on all the gang enhancement's elements as amended by A.B. 333.

In light of the foregoing, we must reverse the true findings for the gang enhancements, vacate Campa's sentence, and remand the matter to give the People the opportunity to retry the allegations under section 186.22, subdivision (b), as amended by A.B. 333.[9] (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [the proper remedy in cases where newly required elements were never tried "is to remand and give the People an opportunity to retry the affected charges"].) On remand, the court shall also conduct a full resentencing, at which Campa may raise arguments under current sentencing laws, including any laws that were enacted or amended after Campa was last sentenced. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 [where "part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

---

[9] We also must reverse the true findings for the gang-related firearm enhancements. To find the firearm allegations true, the jury was required to find Campa violated section 186.22, subdivision (b). (See § 12022.53, subd. (e)(1)(A).) "With the reversal of the gang enhancements under section 186.22, there is an insufficient basis to support the true findings on the vicarious gang-related firearm use enhancements under section 12022.53." (*People v. Perez, supra*, 78 Cal.App.5th at p. 206, fn. 11.) As Campa acknowledges, the firearm enhancements may be reimposed if the People "successfully retr[y] the gang enhancements."

## DISPOSITION

The true findings for the gang and gang-related firearm enhancements are reversed, and Campa's sentence is vacated. The matter is remanded with directions for the trial court to (1) afford the People the opportunity to retry the gang allegations and (2) resentence Campa.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.